IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>JAMES CASTLE, *et al.*,<br><br>    Defendants. | No. C 11-00896 SI<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

On November 4, 2011, the Court heard argument on plaintiff's motion for a preliminary injunction. Having considered the arguments of counsel and the papers submitted, including supplemental briefing after the hearing, the Court hereby GRANTS plaintiff's motion.

**Plaintiffs shall file a proposed form of Preliminary Injunction on or before November 30, 2011.** The TRO currently in effect remains in effect until this Court issues its Preliminary Injunction.

**BACKGROUND**

On August 31, 2011, plaintiffs[1] filed a First Amended Complaint ("FAC") alleging twelve causes of action against defendants.[2] Plaintiffs allege federal causes of action under the Racketeer Influenced

---

[1] Plaintiffs include Fidelity National Title Insurance Company, Ally Bank, Wesley W. Halihan, Gina L. Halihan, Li-Ling Sung, Tiee-Shan Tsai, Tatyana Madina, Commonwealth Land Title Insurance Company, Dawn R. Carifi, Karrie L. Hanna, Brian Phuong, Crichton Friedly, and Janet N. Friedly.

[2] Defendatns include James Castle, Lara Karakasevic, Christopher Piscatelli, Brian Ketih Liberta, John Sanders, Alicia Sanders, Shon-te-east-a, Walks With Spirit, Corporation Sole, John-Michael Di Chiara, Golden Hills Trust, Remus Kirkpatrick, Sarah Contessa, Carolyn Holbert, Laura Pezzi, Carl

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, for racketeering and conspiracy. They also allege several state law causes of action against defendants claiming, in short, that they were defrauded by defendants out of $1.7 million dollars in nine real estate transactions. Pls.' Mem. P. & A. 1:9-13 ("Pls.' MPA"). Plaintiffs also allege that defendants have placed fraudulent liens on over thirty other pieces of real property in California and Arizona, and that defendants are currently attempting to sell those properties to more victims in furtherance of their fraudulent schemes. *Id.* At least one victim has recovered from plaintiff Fidelity National Title Insurance Company ("FNTIC") for their losses, though it is not clear which, if any, of the other victims had title insurance. Heinz Decl. ¶6.

Plaintiffs claim that each of these nine transactions involved a parcel of real property encumbered by one or more bank loan/liens. In each instance, it is alleged that defendants fraudulently reconveyed a deed of trust on the parcel back to themselves, sometimes after placing a sham lien on the property. *See* FAC ¶¶87-92. This reconveyance made it appear as if the property were either free and clear of the original lien(s) against the property and only burdened with defendants' sham lien, or free and clear of liens altogether. Defendants then sold the property to a victim/plaintiff, using the reconveyance to represent falsely to the victims/plaintiffs that the property was unburdened by the original lien. Since the legitimate liens on the property were concealed, the purchase proceeds from the victim/plaintiff flowed to the holders of the sham lien (the defendants) instead of paying off the lender's legitimate lien. Pls.' MPA 1:13-24. When the lender subsequently discovered the fraudulent reconveyance, the lenders declared the reconveyance void and foreclosed on victim/plaintiff's property. *Id.* at 1:22-24.

In one iteration of the scheme - the "Brown Street Scheme" - defendants Lara Karakasevic ("Karakasevic") and her husband James Castle ("Castle") obtained a $396,000 loan from World Savings Bank that was secured by a deed of trust against their single-family residence located at 601 Brown

---

Wallace, Oreplex International LLC, Real Estate Star LLC, Henrik Jensen, Todd J. Smith, Daniel R. Young, Kelly E. Young, Brianna Hanson, Altus Equity LLC, Kevin Keith, Christy Keith, Jennifer Pezzi, Brenda Henderson, Financial Recovery Group, David Thompson, Melissa Thompson, Carl Wallace, CCTT Group, Tisha Trites, Terry Petto, Fahed Eweis, Nadia Eweis, John Winter, Jolee Lange, Ryan Styles, Bug Real Estate, Inc, Randall Crawford, Jason Young, Steve Dunger, Donald Porto, Patricia Porto, Tien Huynh-Dunger, CF Escrow, Inc., Michelle Dornon, Tisha Trites Realty, CJT Financial Group, GJZ Group, Golden Hills Group, AFOG Group, CPC Mission Trust, and DOES 1 through 100.

Street, Santa Rosa, CA ("Brown Street"). *Id.* at 3:13-28; Tamar Schiller Decl., Ex. 1. According to plaintiffs, defendants then fraudulently reconveyed Brown Street back to themselves, using a forged signature of a defendant purporting to represent Wachovia Bank. Pls.' MPA 3:19-21; Pls.' Reply 6:1-3; Tamar Schiller Decl., Ex. 2. Castle then offered to sell Brown Street to the Halihans, informing them that Brown Street was free and clear of all liens. Pls.' MPA 3:27-28. The Halihans purchased Brown Street from defendants for $264,000. *Id* at 4:1. Because of the fraudulent reconveyance, this payment went directly to defendants instead of going to pay off World Saving Bank for the actual liens that still existed on the house. *Id.* at 4:2-5. After the sale closed, World Savings Bank discovered the reconveyance and issued a "Notice of Nonacceptance of a Recorded Deed," stating that the reconveyance was without any force and effect because it had been signed and recorded without the Bank's knowledge. *Id* at 4:6-12; Tamar Schiller Decl., Ex. 3. The bank then initiated foreclosure proceedings against plaintiffs and Brown Street. No information is provided as to whether the Halihans had title insurance with plaintiff FNTIC.

In another model of the scheme, defendant Laura Pezzi borrowed $396,000 from SCME Mortgage Bankers, Inc. in 2006; the loan was later assigned to Aurora Loan Services. FAC ¶114. The loan was secured by a deed of trust ("Aurora DOT") against defendant Pezzi's property, located at 4137 Loch Dane Court, Antelope, California. *Id.* at ¶¶28, 114. In April 2010, defendant Pezzi signed and recorded a $374,000 deed of trust ("Oreplex DOT") in favor of defendant Oreplex International LLC, which plaintiffs allege is controlled by defendant Castle. *Id.* at ¶115. Plaintiffs allege that this was a sham lien in that no money was ever actually loaned to defendants. *Id.* Defendants thereafter executed a reconveyance purportedly reconveying the Aurora DOT back to defendant Pezzi. *Id.* at ¶116. The reconveyance is signed by Carl Wallace as an "authorized representative" of GMAC Mortgage. *Id.* at Ex. 27. In May 2010, Nobuco Financials purchased the property from defendant Pezzi. *Id.* at ¶118. Nobuco Financials then "flipped" the property to Real Estate Star LLC. *Id.* In August 2010, Real Estate Star sold the property to plaintiff Madina. *Id.* at ¶119. However, because of the previous fraudulent reconveyance of the Aurora DOT back to Pezzi, none of the sale proceeds went to pay off the actual lien against the property through the Aurora DOT. *Id.* at ¶120. After the sale closed, Aurora discovered and rescinded the fraudulent reconveyance. *Id.* at ¶121. Aurora has since foreclosed on the Aurora DOT

3

1 and has commenced unlawful detainer proceedings to remove Madina from her residence. *Id.*

2 Plaintiffs also allege ongoing and currently uncompleted fraudulent schemes similar to those already completed that involve several other properties where defendants have borrowed a significant amount of money from a financial institution secured by a deed of trust against defendant's property. *See, e.g.,* FAC ¶¶189-194. Defendants then signed and recorded a deed of trust in favor of a defendant entity in exchange for a loan. Plaintiffs allege that these too are sham transactions because no money is being exchanged between the defendants and the defendant entity. *See, e.g.,* FAC ¶190. Plaintiffs allege that defendants are now attempting to sell these properties in a similar manner as the previously completed transactions. *See, e.g.,* FAC ¶194.

Plaintiffs filed an *ex parte* motion for temporary restraining order to freeze the assets of each defendant, which the Court granted on September 6, 2011. This temporary restraining order was dissolved on September 13, 2011 against all defendants except James C. Castle and related entities owned, managed, or controlled by him: defendants CCTT Group, CJT Financial Group, OREPLEX LLC, and JTF Consulting LLC (collectively, the "enjoined defendants"). The amount currently frozen is $327,000 from two of defendants' accounts. Doc. 59.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an extraordinary remedy never awarded as of right. *Id.* at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689-690, (2008)). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. at 24 (citing *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).

## DISCUSSION

Plaintiffs request a preliminary injunction restraining the enjoined defendants from directly or

4

indirectly transferring, or otherwise disposing of their assets absent further order from the Court. Pls.' MPA 2:14-24. Plaintiffs further request that defendants be ordered to disclose all assets in their possession, custody, or control. *Id.* at 2:24-25. Defendants argue that plaintiffs have not adequately established all requirements necessary to grant a preliminary injunction. Defs.' Opp'n 1:7-8. Defendants also object to consideration of any inadmissible evidence in determining plaintiffs' request for preliminary injunction. Defs.' Admin. Mot. 2:23-25. The Court turns to those objections first.

**I.    Defendants' Evidentiary Objections**

Defendants request that all inadmissible evidence be stricken and not be considered by the Court in determining plaintiffs' motion for preliminary injunction. Defs.' Admin. Mot. 2:23-25. Defendants object to nearly every paragraph of the individual declarations submitted by plaintiffs, on the grounds of foundation, authentication, hearsay, relevance, and lack of personal knowledge. *Id.* at 3:7-10. Plaintiffs argue that the evidence is admissible, but even if it is not, the Court may consider inadmissible evidence at this juncture, when "to do so serves the purpose of preventing irreparable harm before trial." Pls.' Reply 2:2-4, *quoting Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). The Court agrees.

A motion for preliminary injunction must be supported by "[e]vidence that goes beyond the unverified allegations of the pleadings." 9 Wright & Miller, Federal Practice & Procedure § 2949 (2011). A preliminary injunction may be granted on the basis of affidavits. *Ross-Whitney Corp. v. Smith Kline & French Laboratories,* 207 F.2d 190, 198 (9th Cir. 1953). However, at the preliminary injunction stage, "the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sierra Club, Lone Star Chapter v. F.D.I.C.,* 992 F.2d 545, 551 (5th Cir. 1993); *see also Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). ("The urgency of obtaining a preliminary injunction necessitates a prompt determination . . . The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.")

Here, plaintiffs have supported their request for preliminary injunction with the declarations of David Hanna, Wesley Halihan, Li-Ling Sung, Richard Heinz, Roger King, and Brian Phoung, all

plaintiffs and alleged victims of the allegedly fraudulent acts conducted by defendants. Plaintiffs also submit the declaration of Tamar Schiller as custodian of records for plaintiff Fidelity National Title Insurance Company, which sets forth that copies of the real estate records submitted by plaintiffs as exhibits are true copies of the originals. All of these declarations are signed under penalty of perjury and state that all declarants will testify as to the matters contained in the declarations at the time of trial. As this is a motion for a preliminary injunction, the purpose of which is to give speedy relief from irreparable injury, these declarations can be considered and relied upon in adjudicating plaintiffs' motion. Defendants may object to the admissibility of the evidence before trial if necessary. Accordingly, defendants' request that the evidence be stricken and not be considered by the Court in determining plaintiffs' motion for preliminary injunction is DENIED.

## II.     Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs argue that, absent a preliminary injunction, defendants will dissipate or conceal their assets and continue their fraudulent activities. Plaintiffs contend that a preliminary injunction will preserve the possibility of effective relief by securing the funds that plaintiff claims were acquired by defendants through fraudulent activities. Defendants counter that plaintiffs have failed to set forth the correct standard for obtaining a preliminary injunction and have not addressed two of the four required elements. Defendants further contend that plaintiffs have not offered any evidence that they will prevail on their substantive claims or that the drastic remedy of an asset freeze is warranted.

### A.     Plaintiffs' Likelihood of Success on the Merits

Plaintiffs allege that defendants deliberately engaged in an enterprise of schemes that ultimately resulted in the victims paying money for property that, unbeknownst to them, was encumbered by liens. Plaintiffs assert that defendants fraudulently reconveyed property to themselves in order to give the appearance that these properties were free and clear of any liens. *See, e.g.,* Pls.' MPA. 3:27-28. These reconveyances were signed by various defendants -- including Christopher Piscatelli, Sarah Contessa, Carl Wallace, Brianna Hanson, Jennifer Pezzi, Jolee Lange, and Jason Yang -- purporting to be representatives of the initial lending institutions. *See, e.g., Id.* at 3:21-22; Pls.' Reply 6:1-3. Plaintiffs

argue that these defendants did not in fact represent the lending institutions.[3]

According to plaintiffs, after completing these fraudulent reconveyances, defendants sold the property to victims/plaintiffs, representing to them that title to the property was free and clear of liens. *See, e.g.,* Pls.' MPA 3:27-28.; Wesley W. Halihan Decl. ¶5. Plaintiffs claim that the fraudulent reconveyance funneled the victim's purchase money into the defendants' hands, either directly or to pay off "sham loans," leaving the legitimate, enforceable lien on the house unpaid. Li-Ling Sung Decl. ¶6. Various plaintiffs claim that defendants Remus Kirkpatrick and Laura Pezzi told victim/plaintiffs that they (defendants) owned the deed of trust to the property, despite the fact that the banks were initiating foreclosure proceedings on the properties. Richard W. Heinz Decl. ¶¶4-5; Roger King Decl. ¶¶5-9. A number of victim/plaintiffs have had their property foreclosed upon by lenders. Li-Ling Sung Decl. ¶¶5-6; Wesley Halihan Decl. ¶7; Richard W. Heinz Decl. ¶¶3-6. Plaintiffs provide support for their claims through declarations by the home purchasers. In support of these claims, plaintiffs provide more than 92 exhibits comprising 600 pages of evidence supporting their claims.[4]

Despite all of the supporting documentation, defendants argue that plaintiffs have not offered any evidence to show that plaintiffs will prevail on their substantive claims. Defendants claim that their acts were part of a "widely available" and "widely discussed on the internet" "administrative default procedure" that sought to help homeowners sell their homes in a failing market.[5] Defs.' Opp'n 2:2-4;

---

[3] Plaintiffs cite as evidence of the fraudulent nature of the reconveyances the fact that defendant Carl Wallace signed four different reconveyances, all purporting to represent different lending institutions. Pls.' Reply 5:6-10. Plaintiffs attach these reconveyances as exhibits to their complaint as well as their reply motion. Pls.' Reply Ex. A.

[4] On October 17, 2011, plaintiffs submitted a request for judicial notice of a complaint, in a separate case, filed against defendants Todd Smith and Carl Wallace in the Central District of California, alleging substantially similar conduct as in the instant case. Because the existence of the complaint is not subject to dispute and is "capable of ready and accurate determination" as required by Fed. Rules of Evid. §201(b), the Court GRANTS plaintiffs' request for judicial notice of the complaint. *See City of Amsterdam v. Daniel Goldreyer, Ltd.,* 882 F.Supp. 1273, 1278 -1279 (E.D.N.Y.,1995) (stating "a court may take judicial notice of a document filed in another court 'not for the truth of the matter asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'").

[5] Defendants describe their scheme as a novel method to deal with mortgages, "not yet tested in California courts." This is incorrect. A similar scheme was run by D. Scott Heineman, wherein the deed was fraudulently reconveyed, a second mortgage was taken on the "lien-free" home, and the money from the mortgage was misappropriated by Heineman. As a result of these schemes, Heineman was convicted of various federal crimes and was sentenced to 262 months in federal prison. *United States v. Kurt F. Johnson and Dale Scott Heineman,* No. CR 05-00611, Docket 594 (N.D.Cal. March 19,

James Castle Decl. ¶2. Specifically, defendants claim that the "lenders acquiesced in the reconveyance of the deeds of trust for loans that had been separately assigned and then 'securitized' by [the lender]." Defs.' Opp'n 2:5-7. Prior to the reconveyances, defendants sent "Qualified Written Request" letters to the lenders as part of a "securitization audit," seeking validation from the lenders that the property no longer served as security for the loan, due to the lender's selling off of the loan to another servicer. *Id.* at 2:10-17. According to defendants, because the lender sold off the loan, the lender no longer owned the loan that was secured with the property. When the lenders invariably did not reply to the "Qualified Written Request" letters, the defendants – or those in league with them – signed the reconveyances "on behalf of" the lenders. As a result of all this, defendants claim, the lender no longer had a legal right to foreclose on the property.

Defendants do not provide any legal support for the validity of this procedure. They do not contest the heart of plaintiffs' claims -- that the reconveyances were fraudulent.[6] Moreover, as plaintiffs note, the false representation was present even *if* defendants believed that the property was free and clear of the liens, because defendants failed to disclose the use of the "administrative default procedure" to the plaintiff homebuyers, resulting in a justifiable reliance by the plaintiffs on the represented fact that the property had clear title. As a result of this reliance, the victim/plaintiffs paid large sums of money to purchase property from defendants but were later foreclosed on by the initial (authentic) lender.[7]

To support their legal claims, plaintiffs have submitted declarations from each victim, as well as deeds of trust, public records of reconveyances issued to defendants, and notices of nonacceptance of a recorded deed issued by the financial and lending institutions that were the original lenders. They

---

2008).

[6] Defendant Castle states in a footnote (Defs.' Opp'n 6:25-27) that "Plaintiffs also contend that the reconveyances to the home buyers were signed by Carl Wallace as an authorized agent for the original lender. Mr. Wallace is not an enjoined defendant but defendants note that there is no evidence proffered that he is not an authorized agent." This ignores substantial evidence proffered that defendant Carl Wallace is not an authorized agent: the four different banks on whose behalf he signed rejected and rescinded the reconveyances on the basis that they were not authorized. *See note 3*.

[7] The plaintiffs bringing suit are not the original/authentic lenders whose reconveyances were forged; plaintiffs are the purchasers of the homes (and their title insurer), who believed the title to be free and clear of the original lender's lien.

8

have also provided evidence of foreclosures on the subject homes. Therefore, the Court finds that plaintiffs have adequately shown their likelihood of success on the merits.

### B. Likelihood of Irreparable Harm in the Absence of Preliminary Injunction

"Plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. at 22. Plaintiffs argue that they will likely suffer irreparable harm in the absence of a preliminary injunction because defendants will "dispose of, conceal, or send abroad all of the [a]ssets." Pls.' MPA 23:14-16.

Typically, monetary harm alone does not constitute irreparable harm. *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 85-52 (9th Cir. 2009); *see also American Trucking v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009). "Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award." *California Pharmacists*, 563 F.3d at 851. Therefore, a party seeking an asset freeze has the additional burden of showing a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted. *Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009).

Courts are generally unwilling to freeze the assets of a defendant based solely on ipse dixit allegations that a defendant committed fraud. *See Vaccaro v. Sparks*, 2011 WL 772394 (C.D.Ca. 2011) (rejecting a temporary restraining order asset freeze on that basis that "[t]he fact that Defendants may have been engaged in some sort of fraud does not automatically justify the issuance of an asset freeze"); *see also TAGC v. Lehman, Lee & Zu Limited,* 2010 WL 3119254 (C.D. Ca. 2010) (rejecting plaintiff's argument of "reasonable and good faith belief" that the defendants intended to remove the funds at issue from plaintiffs' reach on the basis that the claim as unsupported by evidence).

However, when allegations of past fraud are coupled with supplemental evidence that demonstrates a likelihood of dissipation, courts may freeze assets. In *Johnson v. Courturier*, 572 F.3d 1067 (9th Cir. 2009), the plaintiff-stockholders brought suit against a corporation's president and his fellow directors, claiming that the president was vastly overcompensated, having received $35 million dollars in compensation, which was over 33% of the value of the company's stock. The Ninth Circuit found that if the defendant president was able to convince his fellow directors to consent to diverting

9

1  nearly $35 million from the company into his personal bank account, he was "presumably more than
2  capable of placing assets in his personal possession beyond the reach of a judgment." *Id.* at 1086. In
3  other words, it was not simply the allegation of fraud, but the specific ability to divert funds, that created
4  a likelihood of dissipation. *See also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236-37 (9th Cir.
5  1999) (concluding that the district court did not clearly err in finding a likelihood of dissipation "given
6  the [defendants'] history of spiriting their commissions away to a Cook Islands trust").

7  Here, the plaintiffs have presented adequate evidence demonstrating a likelihood of asset
8  dissipation. The allegations of fraud are well documented, with 92 exhibits comprising 600 pages of
9  evidence. Evidence is provided directly implicating defendants Castle and Karakasevic. For example,
10 the Halihan declaration and the settlement statement from the sale of the Brown Street home show that
11 sums of money paid for the home went directly to Castle and his tax obligations instead of to the Wells
12 Fargo Deed of Trust. *See* Halihan Decl.; FAC Ex. 14. Evidence is also provided implicating the
13 corporate defendants. Defendant Laura Pezzi recorded a $375,000 deed of trust in favor of defendant
14 Oreplex. FAC Ex. 27. The plaintiffs allege, and the defendants do not provide evidence otherwise, that
15 no monies were ever actually paid in the $375,000 "loan." Rather, it appears likely that it was a sham.

16 Defendant Castle's own declaration demonstrates that he effectively plans to dissipate the funds.
17 Currently frozen is $327,000 from the accounts of CCTT, Oreplex, and CJT. In his declaration, Castle
18 argues that he needs $10,445 per month to support his family. Castle Dec. ¶8. Defendants' attorney Ann
19 Draper opposes the injunction because the legal fees for the defense of the case "will be at least
20 $600,000 up through the end of the pre-trial period." Draper Dec. ¶9. Castle declares that "the funds
21 in the frozen accounts are the major source of funds for paying the family living expenses and legal
22 expenses described above." Castle Decl. ¶10. Castle does not explain how or why he uses the funds
23 of these purportedly valid business organizations to fund his personal expenses and personal litigation.
24 Plaintiffs have alleged that these enjoined business organizations are shams set up to assist in
25 perpetuating the fraudulent schemes alleged in the complaint; Castle's declaration provides support to
26 that allegation. Accordingly, the Court finds that it is likely, absent an asset freeze, that Castle will

dissipate the funds causing plaintiffs irreparable harm.[8]

### C. Balance of Equities

The balance of equities also favors plaintiffs. In each case seeking a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 24 (citations omitted).

Defendant Castle argues that he and his family require funds to meet their basic needs and expenses as well as to defend himself in this litigation. Defs.' Opp'n 10:3-6. On the other hand, plaintiffs argue that defendants may dissipate their assets and leave nothing with which to provide adequate relief for the plaintiffs in the likely even that they will prevail on their claims. Pls.' Mot. 2:20-23. The Court finds that as long as the preliminary injunction is sufficiently limited such that it does not freeze Castle's *personal* funds to cover reasonable living expenses, the balance of equities tips in plaintiffs' favor. *See Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) (finding that where an asset freeze permitted defendant to cover normal living expenses and legal fees, the district court correctly concluded that a narrowly tailored asset freeze would prejudice defendant less than a denial of relief would prejudice plaintiffs).[9]

---

[8] Because the Court finds the existence of irreparable harm to the plaintiffs due to the threat of dissipation of the funds, the Court need not rule on whether the funds constitute a constructive trust for the purposes determining this issue.

[9] In their surreply, defendants argue that the nature of this asset freeze is one of attachment, and therefore, plaintiffs must make out the elements required for attachment. Under California Code of Civil Procedure section 483.010, "an attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500) exclusive of costs, interest, and attorney's fees." The four elements required for attachment are: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than recovery of the claim upon which the attachment is based; and (4) the amount to be secured by the attachment is greater than zero. As discussed in this Order, each of these elements has been met by plaintiffs. *See supra, passim*. Further, a court should not refuse the equitable remedy of injunction on the ground that the attachment statute provides an adequate remedy at law. *See* Cal. Code of Civ. Proc. §482.020 (Law Revision Commission Comments).

11

### D. Interest of the Public

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 24. The complaint sets forth a series of at least six ongoing and currently uncompleted fraudulent schemes involving several other properties where defendants have borrowed a significant amount of money from financial institutions secured by a deed of trust against defendants' property. *See, e.g.*, FAC ¶¶189-221. Plaintiffs allege that defendants are attempting to sell these homes to victims, as they have in the instant case. FAC ¶¶194, 199, 205 209, 215, and 221. More generally, the public has an interest in being protected from fraudulent home selling schemes. Therefore, a preliminary injunction would be beneficial for, rather than injurious to, the public's interest.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiffs' motion for preliminary injunction. Plaintiffs are directed to submit to the Court a proposed form of Preliminary Injunction, consistent with this order, continuing the Asset Freeze of the accounts of CCTT, Oreplex, and CJT. The terms and conditions of the Preliminary Injunction shall be substantially similar to those of the TRO already in effect, and the document shall include the names, addresses and account identifiers for the accounts currently subject to freeze. Defendant Castle may seek judicial authorization to withdraw personal and/or legal expenses from the frozen business accounts, but any such petition must include evidence of his authorization to use business funds for personal purposes.

**Plaintiffs shall file their proposed form of Preliminary Injunction on or before November 30, 2011.** The TRO currently in effect remains in effect until this Court issues its Preliminary Injunction. Dockets 72, 84.

**IT IS SO ORDERED.**

Dated: November 23, 2011

SUSAN ILLSTON
United States District Judge