1  Stephen C. Seto (SBN 175458)
   (sseto@wcjuris.com)
2  **BERGQUIST WOOD McINTOSH SETO** LLP
   1470 Maria Lane, Suite 300
3  Walnut Creek, CA 94596
   Telephone: (925) 938-6100
4  Facsimile: (925) 938-4354

5  Attorneys for Plaintiffs FIDELITY NATIONAL TITLE
   INSURANCE COMPANY, CHICAGO TITLE
6  INSURANCE COMPANY AND COMMONWEALTH
   TITLE INSURANCE COMPANY

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  OAKLAND DIVISION

12

13 ALLY BANK, et al.,                    No. C-11-00896 YGR (MEJ)

14        Plaintiffs,                    **[PROPOSED] REPORT &
                                         RECOMMENDATION RE:
15 vs.                                   APPLICATION FOR DEFAULT
                                         JUDGMENT BY PLAINTIFFS FIDELITY
16                                       NATIONAL TITLE INSURANCE
                                         COMPANY, CHICAGO TITLE
17 LARA KARAKASEVIC, et al.,             INSURANCE COMPANY AND
                                         COMMONWEALTH TITLE
18        Defendants.                    INSURANCE COMPANY AGAINST
                                         DEFENDANT REMUS KIRKPATRICK**
19

20                                       Hearing
                                         Date: July 16, 2015
21                                       Time: 10:00 a.m.
                                         Ctrm: B
22                                       Judge: Maria Elena James

23
                           **INTRODUCTION**
24
          Pending before the Court is Plaintiffs FIDELITY NATIONAL TITLE INSURANCE
25
   COMPANY ("FNTIC"), CHICAGO TITLE INSURANCE COMPANY ("CHICAGO
26
   TITLE"), COMMONWEALTH TITLE INSURANCE COMPANY'S
27
   ("COMMONWEALTH") motion for default judgment ("Motion") against Defendant Remus
28

                                  -1-

Kirkpatrick ("Defendant" or "Kirkpatrick"). Dkt. No. 795. Plaintiffs request that the Court enter an order granting default judgment on its claims against Defendant for $2,725,125 in compensatory and treble damages plus pre-judgment and post-judgment interest plus attorney's fees of $453,523.68 and $989.90 in costs. Kirkpatrick has not responded to the Motion. After carefully reviewing Plaintiffs' Motion, evidence and the controlling authorities, the undersigned RECOMMENDS that the District Court grant Plaintiffs' Motion for Default Judgment for the reasons set forth below.

**BACKGROUND**

### The Valley West Scheme

Defendants Fahed Eweis and Nadia Eweis (the "EWEISES") previously owned the property located at 2313 Valley West Drive, Santa Rosa, California ("VALLEY WEST"). Fourth Amended Complaint ["FAC"], ¶¶ 49-50; Dkt No. 398. In September 2005, the EWEISES borrowed $480,000 from Aegis Wholesale Corporation. FAC, ¶ 180. The loan was secured by a deed of trust (the "AEGIS DOT") against VALLEY WEST. *Id.,* FAC, Exh. 62.

In late 2010, the EWEISES began falling behind on their loan with Aegis. The EWEISES, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an "Administrative Default Procedure" ("ADP") whereby the EWEISES executed and recorded a sham lien, forged reconveyance and other fraudulent documents, to deceive future buyers into proceeding with a "short sale" purchase of VALLEY WEST as described more fully below. FAC, p. 3:8-17.

On January 13, 2011 and as part of the ADP, the EWEISES signed a $580,000 deed of trust (the "GH-VALLEY WEST DOT") in favor of defendant Golden Hills Trust ("GOLDEN HILLS TRUST"). FAC, ¶ 182. GOLDEN HILLS TRUST is sham business operated by its principals KIRKPATRICK and Laura Pezzi ("PEZZI") to perpetuate the Valley West scheme and the others set forth below. FAC, ¶¶ 23 and 51. The transaction was fraudulent in that no sums were ever lent by GOLDEN HILLS TRUST to the EWEISES and no monies were owed by the EWEISES to GOLDEN HILLS TRUST. FAC, ¶ 182, FAC, Exh. 63.

[00031644.1]

On March 28, 2011, the EWEISES caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "VALLEY WEST RECONVEYANCE") to be executed and recorded falsely reconveying the AEGIS DOT to themselves. FAC, ¶ 184, Exh. 65.

In April 2011, the EWEISES sold VALLEY WEST to Karrie Hanna for $191,500. FAC, ¶ 185.   When Hanna purchased VALLEY WEST, she purchased title insurance from CHICAGO TITLE. FAC, ¶ 192.  Because of the fraudulent VALLEY WEST RECONVEYANCE, **none** of the sale proceeds from the sale went to pay the AEGIS DOT. FAC, ¶ 189.  Instead, the sale proceeds went to defendants, including GOLDEN HILLS TRUST.  *Id.*

After the sale closed, the beneficiary of the AEGIS DOT foreclosed on the Property. Declaration of Erika Cadwallader ("Cadwallader Decl."), ¶ 6 (Dkt. No. 795-1.)  Hanna then made a claim to CHICAGO TITLE under her title policy.  *Id.*  On April 27, 2012, CHICAGO TITLE paid $191,500 to satisfy Hanna's claim, and CHICAGO TITLE is pursing the Hanna as a subrogee under the title policy.  *Id.*

**Dunlay Drive Scheme**

Defendants Jon and Alicia Sanders (the "SANDERSES") previously owned the property located at 5479 Dunlay Drive, Sacramento, California ("DUNLAY DRIVE").  FAC, ¶¶ 19-20.

In July 2004, the SANDERSES borrowed $396,000 from Countrywide Home Loans n/k/a BAC Home Loans.  FAC, ¶ 110.  The loan was secured by a deed of trust (the "BAC DOT") against the Property. FAC, ¶ 110, Exh. 19.

In the spring of 2010, the SANDERSES began falling behind on their loan with BAC Home Loans.  The SANDERSES, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of DUNLAY DRIVE as described more fully below.  FAC, p. 3:8-17, ¶ 35.

On July 26, 2010, the SANDERSES signed and caused to be recorded a $567,000 deed of trust (the "GH-DUNLAY DRIVE DOT") in favor of GOLDEN HILLS TRUST.  FAC, ¶

[00031644.1]

BERGQUIST WOOD
McINTOSH SETO LLP

111.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the SANDERSES.  FAC, ¶ 111, Exh. 20.

In September 2010, KIRKPATRICK caused a Revised Full Reconveyance (the "DUNLAY DRIVE RECONVEYANCE") to be executed purportedly reconveying the BAC DOT to the SANDERSES.  FAC, ¶ 114, Exh. 22.

On November 17, 2010, Li-Ling Sung and Tiee-Shan Tsai (the "Sungs") purchased Dunlay Drive from the SANDERSES for $195,000.  FAC, ¶¶ 115 and 118.  However, because of the DUNLAY DRIVE RECONVEYANCE, **none** of the sale proceeds went to pay the BAC DOT.  FAC, ¶ 120.  Instead, the proceeds went directly to defendants including GOLDEN HILLS TRUST**.**  FAC, ¶ 120, Exh. 24.

After the sale closed, the predecessor beneficiary of the BNY DOT, Deutsche Bank, discovered the DUNLAY DRIVE RECONVEYANCE.  FAC, ¶¶ 113 and 122.   Deutsche Bank then rescinded the DUNLAY DRIVE RECONVEYANCE and foreclosed on DUNLAY DRIVE.  FAC, ¶ 122, Exhs. 25 and 26.

The Sungs subsequently discovered the Dunlay Drive Scheme, and they made a claim to CHICAGO TITLE under their title policy.  FAC, ¶ 124.  On October 24, 2011, CHICAGO TITLE paid the Sungs $ 195,000 to satisfy their claim.  Cadwallader Decl., ¶ 24.  CHICAGO TITLE is, therefore, subrogated to the Sungs' rights and is pursuing KIRKPATRICK in that capacity. FAC, ¶ 124.

**Shannon Bay Scheme**

Defendants Daniel and Kelly Young (the "YOUNGS") previously owned the property located at 5170 Shannon Bay Drive, Rocklin, California ("SHANNON BAY").  FAC, ¶ 30.

In 2005, the YOUNGS borrowed $340,000 from America's Wholesale Lender.  FAC, ¶ 135.)  The loan, which was eventually assigned to Bank of New York ("BNY"), was secured by a deed of trust (the "BNY DOT") against SHANNON BAY.  (FAC, ¶ 135, Exh. 35.)

In 2006, the YOUNGS borrowed $39,800 from Countrywide Bank (now Bank of America).  (FAC, ¶ 136.)  The loan was secured by a deed of trust (the "BAC DOT").  (FAC, ¶ 136, Exh. 35.)

[00031644.1]

1   In the spring of 2010, the YOUNGS began falling behind on their loan with BNY and
2   BNY commenced foreclosure proceedings.  The YOUNGS, in collaboration with
3   KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby
4   KIRKPATRICK executed fraudulent documents to deceive future buyers into proceeding with
5   a "short sale" purchase of SHANNON BAY as described more fully below.  FAC, p. 3:8-17
6   and ¶ 35.

7   On April 28, 2010, the Youngs signed a $410,000 deed of trust (the "KIRKPATRICK
8   DOT") in favor of KIRKPATRICK.  FAC, ¶ 138.  The transaction was a sham in that no sums
9   were ever lent by KIRKPATRICK to the YOUNGS.  FAC, ¶ 138, Exh. 37.

10   In June 2010, the YOUNGS caused a fraudulent Substitution of Trustee and Deed of
11   Reconveyance (the "FIRST SHANNON BAY RECONVEYANCE") to be executed and
12   recorded falsely reconveying the BNY DOT to themselves.  FAC, ¶ 141, Exh. 39.

13   Also in June 2010, the YOUNGS, in collaboration with KIRKPATRICK caused a
14   fraudulent Substitution of Trustee and Deed of Reconveyance (the "SECOND SHANNON
15   BAY RECONVEYANCE") to be executed and recorded falsely reconveying the BAC DOT to
16   themselves.  FAC, ¶ 143, Exh. 40.

17   In August 2010, the YOUNGS sold SHANNON BAY to Altus Equity for $140,000.
18   FAC, ¶ 145, Exh. 41.  On September 13, 2010, Altus Equity sold the PROPERTY to Eric and
19   Cindy Andersen (the "Andersens") for $190,000.  FAC, ¶ 146, Exh. 42.  As part of the
20   purchase, the Andersens obtained title insurance from COMMONWEALTH.  FAC, ¶ 153.
21   Because of the fraudulent Shannon Bay Reconveyances, **none** of the sale proceeds from either
22   sale went to pay the BNY or BAC DOT.  FAC, ¶ 150.

23   After the sale closed, BNY discovered the FIRST SHANNON BAY
24   RECONVEYANCE and recorded a Rescission of Deed of Reconveyance.  FAC, ¶ 151, Exh.
25   44.  In March 2011, BNY foreclosed on the BNY DOT and the Andersens lost SHANNON
26   BAY.  FAC, ¶ 152, Exh. 45.

27   After the Andersens discovered the Shannon Bay scheme, they made a claim to
28   COMMONWEALTH under their title policy FAC, ¶ 153.  On August 10, 2011,

-5-
FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMMONWEALTH paid $141,871.15 and on August 18, 2011 it paid $48,127.85 to satisfy the Andersens' claim.  Cadwallader Decl., ¶ 9.

**The Roaring Camp Scheme**

Defendants Kevin Keith and Christy Keith (the "KEITHS") previously owned the property located at 1420 Roaring Camp Court, Plumas Lake, CA ("ROARING CAMP").  FAC, ¶ 36.

In December 2005, the KEITHS borrowed $275,000 from Fidelity Home Mortgage ("FHM").  FAC, ¶ 154.  The loan was secured by a deed of trust (the "FHM DOT") against ROARING CAMP.  *Id.,* Exh. 46.

In 2010, the KEITHS began falling behind on their loan with FHM.  The KEITHS, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby defendant executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of ROARING CAMP as described more fully below.  FAC, p. 3:8-17.

In October 2010, the KEITHS signed and caused to be recorded a $283,000 deed of trust (the "GH ROARING CAMP DOT") in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 155*,* Exh. 47.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the KEITHS.  FAC, ¶ 155.  GOLDEN HILLS TRUST is a sham business used by KIRKPATRICK and his co-conspirator PEZZI to further their fraudulent schemes including the Roaring Camp scheme.  FAC, ¶ 59.

In December 2010, Jennifer Pezzi, executed a fraudulent Substitution of Trustee and Deed of Reconveyance (the "ROARING CAMP RECONVEYANCE") to be executed and recorded falsely reconveying the FHM DOT to the KEITHS.  FAC, ¶ 156, Exh. 48. In February 2011, the KEITHS sold ROARING CAMP to Richard W. Heinz, trustee for the Richard W. Heinz Living Trust for $91,000.  FAC, ¶ 157, Exh. 49.   In conjunction with the purchase, Heinz obtained a title policy from FNTIC.  FAC, ¶ 163.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BERGQUIST WOOD McINTOSH SETO LLP

1    Because of the fraudulent ROARING CAMP RECONVEYANCE, **none** of proceeds

2    from Heinz's went to pay the FHM DOT. FAC, ¶ 161. Instead, the sale proceeds went to

3    defendants, including the GOLDEN HILLS TRUST. *Id.*

4    After the sale closed, FHM discovered the ROARING CAMP RECONVEYANCE and

5    disputed its validity. FAC, ¶ 162. Heinz learned of the dispute and he made a claim to FNTIC

6    under his title policy. FAC, ¶ 163. On June 10, 2011, FNTIC paid $108,500 to satisfy Heinz's

7    claim. FAC, ¶ 163; Cadwallader Decl., ¶ 13. FNTIC is pursuing KIRKPATRICK as a

8    subrogee under its title policy. Cadwallader Decl., ¶ 13.

9    **The Almondwood Scheme**

10    Defendant Randall Crawford ("CRAWFORD") previously owned the property located

11    at 7593 Almondwood Avenue, Citrus Heights, CA ("ALMONDWOOD"). FAC, ¶ 58.

12    In 2006, CRAWFORD borrowed $240,500 from Washington Mutual Bank nka

13    JPMorgan Chase, N.A., which was secured by a deed of trust (the "JPM DOT") against

14    ALMONDWOOD. FAC, ¶ 193, Exh. 35.

15    In 2010, CRAWFORD began falling behind on his loan with JPM. CRAWFORD, in

16    collaboration with KIRKPATRICK, responded to his financial difficulties by commencing an

17    ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into

18    proceeding with a "short sale" purchase of ALMONDWOOD as described more fully below.

19    FAC, p. 3:8-17, ¶¶ 59, 62.

20    Also in June 2010, CRAWFORD signed and caused to be recorded a $280,000 deed of

21    trust (the "GH ALMONDWOOD DOT") in favor of defendant GOLDEN HILLS TRUST.

22    FAC, ¶ 194, Exh. 67. The loan was a sham transaction in that no sums were ever lent by

23    GOLDEN HILLS TRUST to CRAWFORD. FAC, ¶ 194. GOLDEN HILLS TRUST is a sham

24    business used by KIRKPATRICK and his co-conspirator PEZZI to further their fraudulent

25    schemes including the Almondwood scheme. FAC, ¶ 59.

26    In October 2010, KIRKPATRICK caused a fraudulent Substitution of Trustee and Deed

27    of Reconveyance (the "ALMONDWOOD RECONVEYANCE") to be executed and recorded

28    falsely reconveying the JPM DOT to CRAWFORD. FAC, ¶ 197, Exh. 71.

[00031644.1]

In January 2011, CRAWFORD sold ALMONDWOOD to Brian Phuong for $77,500. FAC, ¶ 203.  The ALMONDWOOD sale was an alleged short sale in that even though the June 2010 GH-ALMONDWOOD DOT allegedly was for $280,000.  FAC, ¶ 202.  In January 2011, GOLDEN HILLS TRUST agreed to accept $70,234.60 to close the sale.  *Id.,* Exh., 74.  When Phoung purchased ALMONDWOOD, he obtained title insurance from CHICAGO TITLE.  Cadwallader Decl., ¶ 14.

Because of the fraudulent ALMONDWOOD RECONVEYANCE, **none** of the sale proceeds from sale went to pay the JPM DOT.  FAC, ¶ 203.  Instead, the sale proceeds went to KIRKPATRICK's business GOLDEN HILLS TRUST.

After Phoung discovered the Almondwood scheme, he made a claim to CHICAGO TITLE under his title policy, and on February 21, 2014, CHICAGO TITLE paid $95,875 to remove the JPM DOT from ALMONDWOOD.  Cadwallader Decl., ¶ 16-17.   FNTIC is pursing KIRKPATRICK as a subrogee under the title policy.  *Id., ¶* 17.

**The Green Garden Scheme**

Defendants Donald Porto and Patricia Porto (the "PORTOS") previously owned the property located at 6303 Green Garden Drive, Bakersfield, CA ("GREEN GARDEN").  FAC, ¶ 204.

In December 2005, the PORTOS borrowed $300,000 from M&T Mortgage Corporation ("M&T") that was secured by a deed of trust (the "M&T DOT") against GREEN GARDEN.  FAC, ¶ 204, Exh. 75.  In December 2006, the PORTOS borrowed $95,231 from RBS Citizens, N.A. ("RBS") that was secured by a deed of trust (the "RBS DOT") against GREEN GARDEN.  FAC, ¶ 205, Exh. 76.

In 2010, the PORTOS began falling behind on their mortgage obligations.  The PORTOS, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby defendant executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of GREEN GARDEN as described more fully below.  FAC, p. 3:8-17.

[00031644.1]

In October 2010, the PORTOS signed and caused to be recorded a $395,000 deed of trust (the "GH GREEN GARDEN DOT") in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 206, Exh. 77. The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the PORTOS. FAC, ¶ 206. GOLDEN HILLS TRUST is a sham business used by KIRKPATRICK and his co-conspirator PEZZI to further their fraudulent schemes including the Green Garden scheme. FAC, ¶¶ 23 and 68.

In September 2010, KIRKPATRICK caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "FIRST GREEN GARDEN RECONVEYANCE") to be executed and recorded falsely reconveying the M&H DOT to the PORTOS. FAC, ¶ 208, Exh. 79.

Also in September 2010, KIRKPATRICK caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "SECOND GREEN GARDEN RECONVEYANCE") to be executed and recorded falsely reconveying the RBS DOT to the PORTOS. FAC, ¶ 209, Exh. 80.

In December 2010, Crichton Friedly and Janet Friedly purchased GREEN GARDEN. FAC, ¶ 210. However, because of the fraudulent FIRST and SECOND GREEN GARDEN RECONVEYANCES, none of the sale proceeds went to pay the M&T DOT or the RBS DOT. FAC, ¶ 214. Instead, the sale proceeds went to defendants, including the GOLDEN HILLS TRUST. *Id.*

After the Friedlys purchased GREEN GARDEN, RBS Bank filed a complaint against the Friedlys to restore the RBS DOT and foreclose on GREEN GARDEN. Cadwallader Decl., ¶ 20. Bank of America then filed a cross complaint against RBS Bank to restore its BOA DOT. *Id.* The Friedlys made a claim under their title policy, and on May 31, 2012, CHICAGO TITLE paid $10,000 to remove the RBS DOT from GREEN GARDEN and $117,500 to remove the BOA DOT from GREEN GARDEN. *Id.*

## DISCUSSION

### A.    Jurisdiction and Service of Process

In considering whether to enter default judgment, a court must first determine whether it has jurisdiction over the subject matter and the parties to the case. *In re Tuli*, 173 F.3d 707, 712

BERGQUIST WOOD McINTOSH SETO LLP

[00031644.1]

(9th Cir. 1999).

        1.  <u>Subject Matter Jurisdiction</u>

Federal courts are courts of limited jurisdiction and are presumptively without jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court may dismiss an action on its own motion if it finds that it lacks subject matter jurisdiction over the action. *Fiedler v. Clark*, 714 F.2d 77, 78-79 (9th Cir. 1983); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Here, the Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' third and fourth causes of action ("RICO Claims") against KIRKPATRICK arise under the laws of the United States – specifically 18 U.S.C. §§ 1962(c) and (d).  FAC, ¶ 89.  The Court has supplemental jurisdiction to hear the other causes of action against KIRKPATRICK under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the RICO Claims.

        2.  <u>Personal Jurisdiction</u>

"[A] court may exercise personal jurisdiction over a defendant consistent with due process only if he or she has 'certain minimum contacts' with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Here, the Court has personal jurisdiction over KIRKPATRICK because he was an individual residing in California and he had an interest in one of the subject properties. FAC ¶ 26; *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007). Venue is also proper in this District under 28 U.S.C. § 1391 because: (1) one or more of the defendants resides in this District; (2) many of the events giving rise to this litigation occurred in this District; and (3) some of the real property at issue in this case is located in this District.  FAC, ¶ 90.

        3.  <u>Service of Process</u>

Additionally, the Court must "assess the adequacy of the service of process on the party

-10-

[00031644.1]

against whom default is requested." *Bank of the W. v. RMA Lumber Inc.*, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008). "Without a proper basis for jurisdiction, or in the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *S.E.C.*, 504 F.3d at 1138-39.

Plaintiffs served the Summons and complaint on KIRKPATRICK on September 12, 2011. Dkt No. 92. Plaintiffs served the FAC on KIRKPATRICK on May 1, 2013. Dkt No. 409. KIRKPATRICK failed to appear or otherwise respond to the FAC within the time prescribed by the Federal Rules of Civil Procedure Rule 12(a). Dkt No. 439. KIRKPATRICK is not a minor or an incompetent person. Dkt 439-1. KIRKPATRICK is not in military service or otherwise exempted from a default judgment under the Soldiers' and Sailors' Civil Relief Act of 1940. *Id.*

In June 2013, Plaintiffs filed a request for entry of default against KIRKPATRICK. Dkt No. 439. The clerk entered KIRKPATRICK's default on June 7, 2013. Dkt. No. 453.

4. **Legal Standard for Entry of Default Judgment**

Federal Rule of Civil Procedure 55(b)(2) permits a court, following default by a defendant, to enter default judgment in a case. "The district court's decision whether to enter default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In determining whether default judgment is appropriate, the Ninth Circuit has enumerated the following factors for the court to consider: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Where a default judgment is granted, the scope of relief is limited by Federal Rule of Civil Procedure 54(c), which states that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

[00031644.1]

5.   **Application to this Case**

Applying the foregoing *Eitel* factors to the case at bar, the undersigned finds that Plaintiffs are entitled to entry of default judgment.

1.   The possibility of prejudice to the Plaintiff

The first factor that the Court considers in determining whether to grant a default judgment is the possibility of prejudice to Plaintiffs if a default judgment is not entered. *Eitel*, 782 F.2d at 1471-72.   Courts have held that prejudice exists where denying the requested default judgment would leave the plaintiff without a proper remedy.   *See Landstar Range, Inc. v. Parth Enter., Inc.,* 725 F.Supp.2d 916, 920 (C.D.Cal.2010) (concluding that the plaintiff would suffer prejudice if default judgment was not entered where the plaintiff had only received partial payment owed under a contract).   Here, absent entry of a default judgment, Plaintiffs would be prejudiced by having to incur additional fees and costs litigating against KIRKPATRICK even though KIRKPATRICK has not appeared to defend against the FAC.   Accordingly, this factor weighs in favor of entry of default judgment.

2.   The merits of plaintiff's substantive claim and the sufficiency of the complaint

The second and third *Eitel* factors require the Court to look at the merits of Plaintiffs' substantive claims and the sufficiency of the allegations of the Complaint.   *Eitel*, 782 F.2d at 1471-72.   Here, Plaintiffs seek a default judgment on their claims for fraud, conspiracy to defraud violations of RICO and conspiracy to violate RICO.

a.   *FRAUD*

"Under California law, the indispensable elements of a fraud claim include a false representation, knowledge of falsity, intent to defraud, justifiable reliance, and damages." *Vess v. Ciba-Geigy Corp. USA*, 317 F.ed 1097, 1005 (9th Cir.2003) (quotation and citation omitted). Rule 9 of the Federal Rules of Civil Procedure requires a plaintiff to allege a fraud claim with particularity.   Fed. R. Civ. P. 9(b).

-12-

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Here, KIRKPATRICK made several knowing misrepresentations and fraudulent omissions to perpetuate the Valley West, Shannon Bay, Almondwood, Roaring Camp, Green Garden and Dunlay Drive schemes.

**(1) Valley West Scheme**

The EWEISES previously owned VALLEY WEST.  FAC, ¶ 49.  In September 2005, the EWEISES borrowed $480,000 from Aegis Wholesale Corporation that was secured by the AEGIS DOT.  FAC, ¶ 180, Exh. 62.

In 2010, the EWEISES began falling behind on their loan with Aegis.  The EWEISES, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of VALLEY WEST.  FAC, p. 3:8-17, ¶ 51.

In January 2011, the EWEISES signed and caused to be recorded the GH VALLEY WEST DOT in favor of defendant GOLDEN HILLS TRUST, which is controlled by KIRKPATRICK.  FAC, ¶ 182, Exh. 63, FAC, ¶ 51.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the EWEISES.  FAC, ¶ 182.

On March 28, 2011, KIRKPATRICK caused the VALLEY WEST RECONVEYANCE to be executed and recorded falsely reconveying the AEGIS DOT to the EWEISES.  FAC, ¶ 184, Exh. 65.   In April 2011, the EWEISES sold VALLEY WEST to Karrie Hanna for $191,500.  FAC, ¶ 185.  When Hanna purchased VALLEY WEST, she obtained title insurance from CHICAGO TITLE.  Cadwallader Decl., ¶ 24.  Because of the fraudulent VALLEY WEST RECONVEYANCE, **none** of the sale proceeds from sale went to pay the AEGIS DOT.  FAC, ¶ 189.  Instead, the sale proceeds went to KIRKPATRICK's business GOLDEN HILLS TRUST.  *Id.*

After the sale closed, the beneficiary of the AEGIS DOT foreclosed on VALLEY WEST.  Cadwallader Decl., ¶ 27. Hanna made a claim to CHICAGO TITLE under her title policy, and on April 27, 2012, CHICAGO TITLE paid Hanna $191,500 to satisfy her claim.  *Id.*.   CHICAGO TITLE is pursing KIRKPATRICK as a subrogee under the title policy.  FAC, ¶ 192.

BERGQUIST WOOD McINTOSH SETO LLP

{00031644.1}

**(2) Dunlay Drive Scheme**

The SANDERSES previously owned DUNLAY DRIVE.  FAC, ¶¶ 19-20.  In July 2004, the Sanderses borrowed $396,000 that was secured by the BAC DOT against the Property. FAC, ¶ 110, Exh. 19.

In the spring of 2010, the SANDERSES began falling behind on their loan with BAC Home Loans.  The SANDERSES, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of DUNLAY DRIVE as described more fully below.  FAC, p. 3:8-17, ¶ 35.

On July 26, 2010, the SANDERSES signed and caused to be recorded the "GH-DUNLAY DRIVE DOT.  FAC, ¶ 111.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the SANDERSES.  FAC, ¶ 111, Exh. 20.

In September 2010, KIRKPATRICK caused the DUNLAY DRIVE RECONVEYANCE to be executed purportedly reconveying the BAC DOT to the Sanders.  FAC, ¶ 114, Exh. 22.

On November 17, 2010, the Sungs purchased DUNLAY DRIVE from the SANDERSES for $195,000.  FAC, ¶¶ 115 and 118.  However, because of the DUNLAY DRIVE RECONVEYANCE, **none** of the sale proceeds went to pay the BAC DOT.  FAC, ¶ 120.  Instead, the proceeds went directly to defendants including GOLDEN HILLS TRUST**.** FAC, ¶ 120, Exh. 24.

After the sale closed, Deutsche Bank discovered the DUNLAY DRIVE RECONVEYANCE.  FAC, ¶¶ 113 and 122.    Deutsche Bank then rescinded the DUNLAY DRIVE RECONVEYANCE and foreclosed on DUNLAY DRIVE.  FAC, ¶ 122, Exhs. 25 and26.

The Sungs subsequently discovered the Dunlay Drive Scheme, and they made a claim to CHICAGO TITLE under their title policy.  FAC, ¶ 124.  On October 24, 2011, CHICAGO TITLE paid the Sungs $195,000 to satisfy their title claim.  Cadwallader Decl., ¶ 24. CHICAGO TITLE is, therefore, subrogated to the Sungs' rights and is pursuing KIRKPATRICK in that capacity. FAC, ¶ 124.

### (3)    Shannon Bay Scheme

The YOUNGS previously owned SHANNON BAY.  FAC, ¶ 30.  In 2005 and 2006, the YOUNGS entered into two loans: one for $340,000 that was secured by the BNY DOT (FAC, ¶ 135, Exh. 35) and the second for $39,800 from Countrywide Bank that was secured by the BAC DOT.  FAC, ¶ 136, Exh. 36.

In the spring of 2010, the YOUNGS began falling behind on their loan with BNY and BNY commenced foreclosure proceedings.  The YOUNGS, in collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of SHANNON BAY.  FAC, p. 3:8-17, ¶ 35

In June 2010, the YOUNGS, in collaboration with KIRKPATRICK, caused the FIRST SHANNON BAY RECONVEYANCE to be executed and recorded falsely reconveying the BNY DOT to themselves.  FAC, ¶ 141, Exh. 39.)    Also in June 2010, the YOUNGS, in collaboration with KIRKPATRICK, caused the SECOND SHANNON BAY RECONVEYANCE to be executed and recorded falsely reconveying the BAC DOT to themselves.  FAC, ¶ 143, Exh. 40.

In August 2010, the YOUNGS sold SHANNON BAY to Altus Equity for $140,000. FAC, ¶ 145, Exh. 41.  On September 13, 2010, Altus Equity sold the PROPERTY to the Andersens for $190,000.  FAC, ¶ 146, Exh. 42.  Because of the fraudulent Shannon Bay Reconveyances, **none** of the sale proceeds from either sale went to pay the BNY or BAC DOT. FAC, ¶ 150.  Instead, the sale proceeds went to defendants, including the GOLDEN HILLS.  *Id.*

Further, COMMONWEALTH and its insureds, the Andersens, were justified in relying on KIRKPATRICK's representations in the public record that BNY and BAC DOTs had been property reconveyed.  FAC ¶ 142- 144 and 285.  As a result of the execution and recording of the FIRST SHANNON BAY RECONVEYANCE and the SECOND SHANNON BAY RECONVEYANCE, it appeared that the BNY and BAC DOTS had been paid and legally removed.

BERGQUIST WOOD
McINTOSH SETO LLP

{00031644.1}

1    After the sale closed, BNY discovered the FIRST SHANNON BAY

2  RECONVEYANCE and recorded a Rescission of Deed of Reconveyance. FAC, ¶ 151, Exh.

3  44. In March 2011, BNY foreclosed on the BNY DOT and the Andersens lost the

4  PROPERTY. FAC, ¶ 152, Exh. 45.

5    After the Andersens discovered the Shannon Bay scheme, they made a claim to

6  COMMONWEALTH under their title policy FAC, ¶ 153. On August 10, 2011,

7  COMMONWEALTH paid $141,871.15 and on August 18, 2011 it paid $48,127.85 to satisfy

8  the Andersens' claim. Cadwallader Decl., ¶ 9.

9    **(4)    The Roaring Camp Scheme**

10    The KEITHS previously owned ROARING CAMP. FAC, ¶ 36. In December 2005, the

11  KEITHS borrowed $275,000 from FHM (FAC, ¶ 154) that was secured by the FHM DOT.

12  FAC, ¶ 154, Exh. 46.

13    In 2010, the KEITHS began falling behind on their loan with FHM. The KEITHS, in

14  collaboration with KIRKPATRICK, responded to their financial difficulties by commencing an

15  ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into

16  proceeding with a "short sale" purchase of ROARING CAMP as described more fully below.

17  FAC, p. 3:8-17.

18    In October 2010, the KEITHS signed and caused to be recorded the GH ROARING

19  CAMP DOT in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 155, Exh. 47. The loan

20  was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the

21  KEITHS. FAC, ¶ 155. GOLDEN HILLS TRUST is a sham business used by

22  KIRKPATRICK, PEZZI and others to further their fraudulent schemes including the Roaring

23  Camp scheme. FAC, ¶ 59.

24    In December 2010, Jennifer Pezzi, executed the ROARING CAMP RECONVEYANCE

25  falsely reconveying the FHM DOT to the KEITHS. FAC, ¶ 156, Exh. 48. In February 2011,

26  the KEITHS sold ROARING CAMP to FNTIC's insured, Heinz, for $91,000. FAC, ¶ 157,

27  Exh. 49. Because of the fraudulent ROARING CAMP RECONVEYANCE, **none** of proceeds

28

BERGQUIST WOOD
McINTOSH SETO LLP

from Heinz's went to pay the FHM DOT.  FAC, ¶ 161.  Instead, the sale proceeds went to KIRKPATRICKS's company GOLDEN HILLS TRUST, among others.  *Id.*

Further, FNTIC and its insured, Heinz, were justified in relying on KIRKPATRICK'S representations that the GH ROARING CAMP DOT was a valid obligation that had to be paid as part of any purchase and sale of ROARING CAMP.  FAC, ¶¶ 59, 155 and Exh. 47.

After the sale closed, FHM discovered the ROARING CAMP RECONVEYANCE and disputed its validity.  FAC, ¶ 162.  Heinz learned of the dispute and he made a claim to FNTIC under his title policy.  FAC, ¶ 163.  On June 10, 2011, FNTIC paid $108,500 to satisfy Heinz's claim.  FAC, ¶ 163; Cadwallader Decl., ¶ 12-13.  FNTIC is pursuing KIRKPATRICK as a subrogee under its title policy.  Cadwallader Decl., ¶ 13.

**(5)    Almondwood Scheme**

CRAWFORD previously owned ALMONDWOOD.  FAC, ¶ 30.  In 2006, CRAWFORD borrowed $240,500 that was secured by the JPM DOT.  FAC, ¶ 193, Exh. 35.

In the spring of 2010, CRAWFORD began falling behind on his loan.  CRAWFORD, in collaboration with KIRKPATRICK, responded to CRAWFORD'S financial difficulties by commencing the ADP whereby KIRKPATRICK executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of ALMONDWOOD.  FAC, p. 3:8-17, ¶¶ 59 and 62.

In June 2010, and as part of the ADP, CRAWFORD quitclaimed ALMONDWOOD to defendant Shon-Te-East-A.  FAC, ¶ 195, Exh. 68.  The assignment was notarized by PEZZI.  FAC, ¶ 195, Exh. 69.

Also in June 2010, CRAWFORD signed and caused to be recorded the GH ALMONDWOOD DOT in favor of defendant GOLDEN HILLS TRUST.  FAC, ¶ 194, Exh. 67.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to CRAWFORD.  FAC, ¶ 194.  GOLDEN HILLS TRUST is a sham business used by KIRKPATRICK, PEZZI and others to further their fraudulent schemes including the Almondwood scheme.  FAC, ¶ 59.

{00031644.1}

In October 2010, KIRKPATRICK caused the ALMONDWOOD RECONVEYANCE to be executed and recorded falsely reconveying the JPM DOT to CRAWFORD.  FAC, ¶ 197, Exh. 71.

In January 2011, CRAWFORD sold ALMONDWOOD to insured Brian Phuong for $77,500.  FAC, ¶ 203.  The ALMONDWOOD sale was an alleged short sale in that even though the June 2010 GH-ALMONDWOOD DOT allegedly was for $280,000.  FAC, ¶ 202.  In January 2011, GOLDEN HILLS TRUST agreed to accept $70,234.60 to close the sale.  *Id.,* Exh., 74.

Because of the fraudulent ALMONDWOOD RECONVEYANCE, **none** of the sale proceeds from sale went to pay the JPM DOT.  FAC, ¶ 203.  Instead, the sale proceeds went to KIRKPATRICK's business GOLDEN HILLS TRUST.  FAC, ¶¶ 202 and 203.

CHICAGO TITLE and its insured, Phoung, were justified in relying on KIRKPATRICK's representations in that (a) the GH-ALMONDWOOD DOT was a valid deed of trust that had to be paid as the part of any sale and (b) the JPM DOT was no longer enforceable.  FAC, ¶¶ 59, 194, 197, 202-203, Exhs. 67, 71and 74.   As a result of the execution and recording of the GH-ALMONDWOOD DOT AND THE ALMONDWOOD RECONVEYANCE, it appeared that the JPM DOT had been paid and legally replaced by the GH-ALMONDWOOD DOT.

After Phoung discovered the Almondwood scheme, he made a claim to CHICAGO TITLE under his title policy, and on February 21, 2014, CHICAGO TITLE paid $95,875 to satisfy Phoung's claim.  Cadwallader Decl., ¶ 17.   CHICAGO TITLE is pursing KIRKPATRICK as a subrogee under the title policy.  *Id.*

### (6)    The Green Garden Scheme

The PORTOS previously owned GREEN GARDEN.  FAC, ¶ 204; Dkt No. 398.  In December 2005, the PORTOS borrowed $300,000 from M&T that was secured by the M&T DOT.  FAC, ¶ 204, Exh. 75.  In December 2006, the PORTOS borrowed $95,231 from RBS that was secured by the RBS DOT.  FAC, ¶ 205, Exh. 76.

{00031644.1}

1    In 2010, the PORTOS began falling behind on their mortgage obligations.  The

2    PORTOS, in collaboration with KIRKPATRICK, responded to their financial difficulties by

3    commencing the ADP whereby KIRKPATRICK executed fraudulent documents to deceive

4    future buyers into proceeding with a "short sale" purchase of GREEN GARDEN.  FAC, p. 3:8-

5    17.

6    In October 2010, the PORTOS executed the GH GREEN GARDEN DOT in favor of

7    defendant GOLDEN HILLS TRUST.  FAC, ¶ 206, Exh. 77.  The loan was a sham transaction

8    in that no sums were ever lent by GOLDEN HILLS TRUST to the PORTOS.  FAC, ¶ 206.

9    GOLDEN HILLS TRUST is a sham business used by KIRKPATRICK, PEZZI and others to

10    further their fraudulent schemes including the Green Garden scheme.  FAC, ¶¶ 23 and 68.

11    In September 2010, KIRKPATRICK caused the FIRST GREEN GARDEN

12    RECONVEYANCE to be executed and recorded falsely reconveying the M&H DOT to the

13    PORTOS.  FAC, ¶ 208, Exh. 79.   Also in September 2010, KIRKPATRICK caused the

14    SECOND GREEN GARDEN RECONVEYANCE to be executed and recorded falsely

15    reconveying the RBS DOT to the PORTOS.  FAC, ¶ 209, Exh. 80.

16    In December 2010, Crichton Friedly and Janet Friedly purchased GREEN GARDEN.

17    FAC, ¶ 210.  However, because of the fraudulent FIRST and SECOND GREEN GARDEN

18    RECONVEYANCES, none of the sale proceeds went to pay the M&T DOT or the RBS DOT.

19    FAC, ¶ 214.  Instead, the sale proceeds went to defendants, including the GOLDEN HILLS

20    TRUST.  *Id.*

21    CHICAGO TITLE and its insureds, the Friedlys, were justified in relying on

22    KIRKPATRICK's representations in that (a) the GH GREEN GARDEN DOT was a valid deed

23    of trust that had to be paid as the part of any sale and (b) the M&T AND RBS DOTs were no

24    longer enforceable.  FAC, ¶¶ 23, 68, 206, 208-209, Exhs. 77, 79 and 80.   As a result of the

25    execution and recording of the GH GREEN GARDEN DOT AND THE FIRST and SECOND

26    GREEN GARDEN RECONVEYANCES, it appeared that the M&T and RBS DOTs had been

27    paid and legally replaced by the GH GREEN GARDEN DOT.

28

BERGQUIST WOOD McINTOSH SETO LLP

{00031644.1}

After the Friedlys purchased GREEN GARDEN, RBS Bank filed a complaint against the Friedlys to restore the RBS DOT and foreclose on GREEN GARDEN.  Cadwallader Decl., ¶ 20.  Bank of America then filed a cross complaint against RBS Bank to restore its BOA DOT. *Id.*  The Friedlys made a claim under their title policy, and on May 31, 2012, CHICAGO TITLE paid $10,000 to remove the RBS DOT from GREEN GARDEN and $117,500 to remove the BOA DOT from GREEN GARDEN.  *Id.*

        b.   *CONSPIRACY TO DEFRAUD*

As to the claim of conspiracy to defraud, conspiracy is a "legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Arei II Cases*, 216 Cal. App. 4th 1004, 1021-22 (2013) citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). A civil conspiracy "must be activated by the commission of an actual tort," such as fraud. *Id.*

To support a conspiracy claim, a plaintiff must allege the following elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Id.* (citing *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995)). While a complaint must contain more than a bare allegation that the defendants conspired, a complaint is sufficient if it apprises the defendant of the character and type of facts and circumstances upon which she was relying to establish the conspiracy. *Id.* (citing *Schessler v. Keck*, 125 Cal. App. 2d 827, 833 (1954)).

While a party seeking to establish a civil conspiracy must show that the members acted in concert, knew of the intended act, and agreed tacitly to achieve that act, "[i]t must be recognized, however, that because of the very nature of a conspiracy, 'its existence must often be inferentially and circumstantially derived from the character of the acts done, the relations of the parties and other facts and circumstances suggestive of concerted action.'" *Id.* "While a complaint must contain more than a bare allegation the defendants conspired, a complaint is sufficient if it apprises the defendant of the 'character and type of facts and circumstances upon which she was relying to establish the conspiracy.'" *Id.* (internal citations omitted).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031644.1]

1   Here, Plaintiffs alleged the formation and operation of the conspiracy between

2   KIRKPATRICK, PEZZI, GOLDEN HILLS TRUST and OREPLEX which consisted of a plan

3   to execute and record fraudulent documents to stop foreclosure proceedings against LOCH

4   DANE, DUNLAY DRIVE, SHANNON BAY, ROARING CAMP, ALMONDWOOD and

5   GREEN GARDEN that made it seem as though (1) the valid liens against the properties had

6   been satisfied, and (2) GOLDEN HILLS TRUST, OREPLEX OR KIRKPATRICK had a valid

7   lien against the property that had to be paid through any sale.

8   KIRKPATRICK participated in the Loch Dane, Dunlay Drive, Shannon Bay, Roaring

9   Camp, Almondwood and Green Garden schemes to defraud Plaintiffs by causing the execution

10  and recordation of the fraudulent OREPLEX DOT, GH DUNLAY DRIVE DOT,

11  DUNLAYDRIVE RECONVEYANCE, LOCH DANE RECONVEYANCE, SHANNON BAY

12  NOTICE OF RESCISSION, FIRST SHANNON BAY RECONVEYANCE, SECOND

13  SHANNON BAY RECONVEYANCE, GH ROARING CAMP DOT, GH ALMONDWOOD

14  DOT, ALMONDWOOD RECONVEYANCE, FIRST GREEN GARDEN RECONVEYANCE,

15  SECOND GREEN GARDEN RECONVEYANCE and GH GREEN GARDEN DOT.  These

16  fraudulent documents made it appear to Plaintiffs that the prior liens had been paid off, that

17  there were no encumbrances on the subject property other than defendants' deeds of trust, that

18  the foreclosure proceedings against the subject property had been stopped, and that

19  KIRKPATRICK, PEZZI and their other co-conspirators were entitled to the sale proceeds of

20  the properties rather than the legitimate lienholder.  If the properties had been foreclosed upon

21  or sold legally, PEZZI, KIRKPATRICK, GOLDEN HILLS TRUST and OREPLEX would not

22  have received any money whatsoever.

23  As a result of the KIRKPATRICK's participation in the conspiracy to defraud Plaintiffs

24  as subrogee, Plaintiff have been damaged in the principal amount of $908,375 plus interest.

25  *c.  VIOLATIONS OF RICO (18 U.S.C. § 1962(c))*

26  The Supreme Court has declared that: "[T]he Racketeer and Corrupt Practices Act

27  ('RICO')] is to be read broadly . . . [t]his is the lesson not only of Congress' self-consciously

28  expansive language and overall approach, but also of its express admonition that RICO is to be

-21-

[00031644.1]

1   literally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.* 473 U.S.

2   479, 490 (1985).  Indeed, the Supreme Court has consistently reversed appellate decisions that

3   narrowly interpret and apply the provisions of RICO.  *See*, e.g., *United States v. Turkette*, 452

4   U.S. 576 (1981) (reversing narrow reading that RICO only prohibits infiltration of legitimate

5   businesses and not illegitimate enterprises); *Sedima, S.P.R.L, supra*, 473 U.S. at 479 (reversing

6   narrow reading that RICO imposes liability only on those who are criminally convicted).

7       The elements of a civil RICO claim are as follows: "(1) conduct (2) of an enterprise (3)

8   through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to

9   plaintiff's 'business or property.' " *Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir.1996) (citing

10  18 U.S.C. §§ 1964(c), 1962(c)).

11          (1) <u>The Enterprise</u>

12      "[T]o establish liability under § 1962(c) one must allege and prove the existence of two

13  distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

14  referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161,

15  (2001)   The term "enterprise" is defined in 18 U.S.C. § 1961(4) as "any individual, partnership,

16  corporation, association, or other legal entity, and any union or group of individuals associated

17  in fact although not a legal entity." *Living Designs, Inc., v. E.I. Dupont de Nemours and Co*.,

18  431 F.3d 353, 361 (9th Cir. 2005).

19      Here, the "person" is KIRKPATRICK, and the "enterprise" is an association-in-fact that

20  engaged in the business of real estate sales, real estate leasing, mortgage loans, notarizing real

21  property documents, performing escrow services, performing real estate brokerage services and

22  other activities affecting interstate commerce.  FAC, ¶ 298.  The primary purpose of the

23  enterprise was to defraud plaintiffs through a series of phantom loans, fraudulent

24  reconveyances, phony short sales and subsequent re-sales.  *Id.*  Defendants, including

25  KIRKPATRICK, worked together as members of the enterprise to achieve the association's

26  purpose of defrauding plaintiffs.  *Id.*  Examples of such cooperation include the execution and

27  recordation of the fraudulent OREPLEX DOT, GH DUNLAY DRIVE DOT, DUNLAY

28  DRIVE RECONVEYANCE, LOCH DANE RECONVEYANCE, SHANNON BAY NOTICE

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

OF RESCISSION, FIRST SHANNON BAY RECONVEYANCE, SECOND SHANNON BAY RECONVEYANCE, GH ROARING CAMP DOT, GH ALMONDWOOD DOT, ALMONDWOOD RECONVEYANCE, FIRST GREEN GARDEN RECONVEYANCE, SECOND GREEN GARDEN RECONVEYANCE and GH GREEN GARDEN DOT and the diversion of sale proceeds from legitimate lenders to the enterprise, KIRKPATRICK and the other defendants.  The enterprise has been operating for a period of almost two years to allow defendants to pursue their fraudulent scheme and is ongoing.  FAC, ¶ 299.

> (2)  <u>KIRKPATRICK participated in the Enterprise's Affairs Through a Pattern of "Racketeering Activity."</u>

18 U.S.C. § 1962(c) requires that the defendant conduct or participate "directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity...." *Sun Sav. And LoanAss'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir.1987).  Participate means to "take part in."  Thus, to participate, directly or indirectly, in the enterprise one must have some part in directing those affairs."  *Walter v. Drayson*, 538 F.3d 1244, 1247-1248 (9th Cir. 2008).

"Racketeering activity" is defined in Section 1961 and includes numerous examples of what constitutes "racketeering activity."  The definition of racketeering activity in Section 1961(B) includes any act indictable under the various provisions of Title 18 of the United States Code, including but not limited to section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) and section 1344 (relating to financial institution fraud).  To establish a pattern of racketeering activity, the plaintiff must show the existence of at least two predicate racketeering acts that are related and that "amount to or pose a threat of continued criminal activity." *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir.1991).

As set forth below, KIRKPATRICK participated in the enterprise's affairs through numerous acts of wire, mail and bank fraud.

> i.     Wire Fraud

Federal statutes prohibit the use of "interstate wire, radio or television communications" to perpetuate "any scheme to artifice to default."  18 U.S.C. § 1343   "The only essential

BERGQUIST WOOD McINTOSH SETO LLP

[00031644.1]

1    elements of mail fraud under 18 U.S.C. § 1341 are that the defendant devised a scheme to

2    defraud and that for the purpose of executing this scheme he used the mails or caused the mails

3    to be used." *U.S. v. Outpost Development Co*., 552 F.2d 868, 870 (9th Cir. 1977).  The

4    elements for wire fraud are the same as mail fraud, except that the defendant used wires instead

5    of mail.  18 U.S.C. § 1343; *Fountain v. U.S.*, 357 F.3d 250, 255 (2nd Cir. 2004).

6         Here, KIRKPATRICK participated in the enterprise's affairs through a pattern of wire

7    fraud by causing the OREPLEX DOT, GH VALLEY WEST DOT, VALLEY WEST

8    RECONVEYANCE, GH DUNLAY DRIVE DOT, DUNLAY DRIVE RECONVEYANCE,

9    LOCH DANE RECONVEYANCE, SHANNON BAY NOTICE OF RESCISSION, FIRST

10   SHANNON BAY RECONVEYANCE, SECOND SHANNON BAY RECONVEYANCE, GH

11   ROARING CAMP DOT, GH ALMONDWOOD DOT, ALMONDWOOD

12   RECONVEYANCE, FIRST GREEN GARDEN RECONVEYANCE, SECOND GREEN

13   GARDEN RECONVEYANCE and GH GREEN GARDEN DOT to be electronically recorded

14   into the public record.  KIRKPATRICK also participated in wire fraud when his company,

15   GOLDEN HILLS TRUST, electronically received payments on the GH DUNLAY DRIVE

16   DOT, GH ROARING CAMP DOT, GH ALMONDWOOD DOT and GH GREEN GARDEN

17   DOT.  See e.g., FAC, ¶¶ 120, 295, 300, 302 and 304.  The enterprise's pattern of fraudulent

18   activity has continued for a period of over two years and is ongoing.  FAC, ¶¶ 295 and 301.

19                                    ii.     Mail Fraud

20        KIRKPATRICK also participated in the enterprise's affairs through a pattern of mail

21   fraud by directing on the VALLEY WEST RECONVEYANCE, DUNLAY DRIVE

22   RECONVEYANCE, LOCH DANE RECONVEYANCE, SHANNON BAY NOTICE OF

23   RESCISSION, FIRST SHANNON BAY RECONVEYANCE, SECOND SHANNON BAY

24   RECONVEYANCE, ALMONDWOOD RECONVEYANCE, FIRST GREEN GARDEN

25   RECONVEYANCE and SECOND GREEN GARDEN RECONVEYANCE that copies of this

26   documents be mailed when recorded.  FAC, ¶¶ 295 and 303.

27                                    iii.    Bank Fraud

28        In order to establish bank fraud under 18 U.S.C. § 1344, it is sufficient if plaintiff shows

-24-

{00031644.1}

that defendant obtained funds from a financial institution by means of false or fraudulent

pretenses, representations or promises.  *U.S. v. Schwartz*, 899 F.2d 243, 246 (3d Cir. 1990),

*cert. denied*, 498 U.S. 901 (1990); *Weiner v. Napoli*, 772 F.Supp. 109, 119-120 (E.D.N.Y.

1991).

Here, KIRKPATRICK participated in the enterprise's affairs through a pattern of bank

fraud through the execution and recordation of the GH VALLEY WESY DOT, GH DUNLAY

DRIVE DOT, GH ROARING CAMP DOT, GH ALMONDWOOD DOT and GH GREEN

GARDEN DOT which resulted in funds being diverted from the legitimate lenders to the

enterprise and ultimately KIRKPATRICK, PEZZI and the other defendants.  FAC, ¶¶ 295 and

304.

(3) <u>KIRKPATRICK's Conduct Proximately Injured Plaintiffs</u>

Finally, Plaintiffs must be "injured in [their] business or property by reason of a

violation of section 1962."  18 U.S.C. § 1964(c)  Here, Plaintiffs were injured by the

KIRKPATRICK'S conduct  because they were forced to pay their insured approximately

$908,375 as a result of KIRKPATRICK's involvement in the Valley West, Dunlay Drive,

Shannon Bay, Roaring Camp, Almondwood and Green Garden schemes.  Plaintiffs also were

damaged because they have incurred $453,923.68 in attorney's fees and $989.90 in costs

prosecuting this action.  FAC, pp. 65-66; Cadwallader Decl., ¶ 25.

b.    *CONSPIRACY TO VIOLATE RICO*

Section 1962(d) makes it unlawful for a person "to conspire to violate any of the

provisions of subsections (a), (b) or (c) of [section 1961]."  In addition, "[t]he existence of this

agreement [to conspire] may be either express or inferred from a defendant's conduct." *In Re*

*3Com Securities Litigation*, 761 F.Supp. 1411, 1418 (N.D.Cal. 1990).

KIRKPATRICK violated 18 U.S.C. § 1962(d) because she agreed with the other

defendants to participate in the affairs of an enterprise through a pattern of racketeering activity,

or agreed to assist or profit from such conduct or participation.  FAC, ¶ 308.  In addition,

KIRKPATRICK knew his conduct or the conduct of his co-conspirators such as PEZZI

constituted a pattern of racketeering activity.  *Id.*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031644.1]

KIRKPATRICK knew his and the other defendants' predicate acts were part of a pattern of racketeering activity because of the similarity and frequency of the events in the scheme. FAC, ¶ 309.  KIRKPATRICK's conduct has injured and damaged plaintiffs in the principal amount of $908,375.  Plaintiffs also were damaged because they have incurred $453,523.68 in attorney's fees and $989.90 in costs prosecuting this action.  FAC, pp. 65-66; Cadwallader Decl., ¶ 25.   Finally, KIRKPATRICK's conduct has harmed the general public and threatens continued harm.  FAC, ¶¶ 304-305.

3.   The sum of money at stake in the action

The fourth *Eitel* factor addresses the amount of money at stake in relation to the seriousness of the defendant's conduct.  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp 2d 1172, 1176 (C.D.Cal.2002).  When the amount at stake is substantial or unreasonable in light of the allegations in the complaint, default judgment is disfavored.  *See Eitel,* 782 F.2d at 1472.  (affirming the denial of default judgment where the plaintiff sought $3 million in damages and the parties disputed material facts in the pleadings).

Here, Plaintiffs seek $2,725,125 in compensatory and treble damages plus interest plus attorney's fees, which is proportional to the harm caused by KIRKPATRICK's conduct.  *See FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir.2009) (affirming award of over $17 million in equitable monetary relief that represented the amount of loss incurred by consumers); *FTC v. Springtech 77376 LLC*, 2013 WL 5955395 at *2 (C.D.Cal. May 30, 2014) (finding $7,279,000 in damages appropriate where proportional to the seriousness of the defendants' conduct and where the damages represented the actual amount consumers paid for defendants' products).  The principal amount of money at stake equals the amount of money Plaintiffs had to pay their insureds.  Accordingly, this factor weighs in favor of entry of default judgment.

4.   The possibility of dispute concerning material facts

The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case.  *Eitel*, 782 F.2d at 1471-72.  Here, no genuine issues of material fact are likely to exist because the allegations in the complaint are

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

taken as true.  *Televideo Sys., Inc., v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1992).

Upon entry of default, the defendant is "deemed to have admitted all well-pleaded factual

allegations" in the complaint.  *DirectTV, Inc.v. Hoa Huynh*, 503 F.3d 847, 851 (9th Cir.

2007).  Thus, this factor favors entry of default judgment.

> 5.    Whether default was due to excusable neglect

The sixth *Eitel* factor examines whether KIRKPATRICK's failure to respond to the

FAC was the result of excusable neglect.  *Eitel*, 782 F.2d at 1471-72.  As set forth above,

KIRKPATRICK was given adequate notice of this lawsuit.  Second, Plaintiffs named

KIRKPATRICK to this action in the FAC, which was filed on April 30, 2013.

KIRKPATRICK was properly served.  After he failed to answer, the Clerk of the Court

entered default against him.  There is nothing in the record suggesting that

KIRKPATRICK'S failure to appear and litigate this matter is based on excusable neglect.

*See Shanghai Automation Instr. Co. v. Kuei*, 194 F.Supp.2d 995, 1005 (N.D.CA. 2001)

(default after proper service was not excusable neglect).  Thus, this factor support default

judgment.

> 6.    The strong policy underlying the Federal Rules of Civil Procedure
>        favoring decisions on the merits

The last *Eitel* factor examines whether the policy of deciding a case based on the merits

precludes entry of default judgment. *Eitel*, 782 F.2d at 1472. In *Eitel*, the Ninth Circuit

admonished that "[c]ases should be decided on their merits whenever reasonably possible." *Id.*

However, courts have recognized that "the mere existence of [Rule 55(b)] indicates that this

preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal

quotation and citation omitted).  Similarly, other courts have stated that default judgment is

appropriate when a defendant refuses to litigate a case. *See, e.g.*, *Bd. of Trs. v. RBS Wash. Blvd,*

*LLC*, 2010 WL 145097, at *4 (N.D. Cal. Jan. 8, 2010).  Here, KIRKPATRICK has not

responded to communication efforts by Plaintiffs or participated in these proceedings.  As such,

a decision on the merits would not be possible.  In situations such as this, Rule 55(b) allows the

Court to grant default judgment. Thus, this final factor weighs in favor of granting Plaintiffs'

[00031644.1]

Motion.

7.     Summary of the *Eitel* Factors

Based on the foregoing analysis, the undersigned finds that each of the *Eitel* factors weighs in favor of granting default judgment and it will enter default judgment against KIRKPATRICK on Plaintiffs' claims for fraud, conspiracy to defraud violations of RICO and conspiracy to violate RICO.

**D.**     **Relief Sought**

After determining liability, the Court then calculates the amount of damages that should be awarded. *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1078 (C.D. Cal. 2012). This two-step process is proper because, while for purposes of default judgment the Court generally accepts as true the factual allegations of the complaint, the Court need not do so regarding damages. *Id.*

Plaintiffs were required to make $907,875 in payments to their insureds as a result of KIRKPATRICK's conduct:

| Insured | Scheme | Damages | Date | Interest/Day |
|---------|--------|---------|------|--------------|
| Hanna | Valley West | $191,5~~0~~00 | 4/27/12 | $36.63 |
| Sungs | Dunlay Drive | $195,000 | 11/17/10 | $37.40 |
| Andersens | Shannon Bay | $190,000 | 8/18/11 | $36.44 |
| Heinz | Roaring Camp | $108,500 | 6/10/11 | $20.80 |
| Phuong | Almondwood | $95,875 | 2/21/14 | $18.39 |
| Friedlys | Green Garden | $127,500 | 6/10/11 | $24.45 |

Under 18 U.S.C. § 1964(c), a plaintiff who prevails on a RICO claim is entitled to recover treble damages. *H.J. Inc. v. Northwestern Bell, supra,* 492 U.S. at 232; *Alexander v. Incway Corp.*, 2013 WL 5603932, * 20 (C.D.CA). Plaintiffs, therefore, seek damages of $~~907,875~~908,375 x 3 or $~~2,723,625~~2,725,125.

Plaintiffs also seek prejudgment interest on the amount it was required to pay its insureds. In California, there is no statute setting the rate of prejudgment interest for a fraud claim, therefore, the constitutional rate of 7% applies. *Michaelson v. Hameda*, 29 Cal.App.

[00031644.1]

4th 1566, 1587 (1994).  Thus, Plaintiffs respectfully requests an award of prejudgment interest

at the rate of 7% per annum as set forth in the chart above until the judgment is entered.

Further, 18 U.S.C. § 1964(c) states that a plaintiff who prevails on a RICO claim is

entitled to recover attorney's fees.  *H.J. Inc., 492 U.S. at 232; Alexander v. Incway Corp.*,

*supra,* 2013 WL 5603932, * 20.  Plaintiffs have incurred $453,523.68 in attorney's fees

prosecuting this action and $989.90 in costs; therefore, Plaintiffs seek a judgment against

KIRKPATRICK for those sums.  FAC, pp. 65-66; Cadwallader Decl., ¶ 25.

Next, Plaintiffs request an award of post-judgment interest.  While state law determines

the rate of prejudgment interest in diversity actions, post-judgment interest is governed by

federal law. 28 U.S.C. § 1961; *Citicorp Real Estate v. Smith*, 155 F.3d 1097, 1107-08 (9th Cir.

1998). Plaintiffs are therefore entitled to post-judgment interest at the federal rate pursuant to

28 U.S.C. § 1961, to be calculated from the date of the entry of judgment. Post-judgment

interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly

average 1-year constant maturity Treasury yield, as published by the Board of Governors of the

Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C.

§ 1961(a). Thus,  Plaintiffs request post-judgment interest at a rate equal to the weekly average

1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal

Reserve System, for the calendar week preceding the date of the judgment.

## CONCLUSION

Based on this analysis, the undersigned RECOMMENDS that the District Court enter a

default judgment in favor of Plaintiffs for fraud, conspiracy to defraud, violations of RICO and

conspiracy to violate RICO against KIRKPATRICK as follows:

Compensatory and Treble Damages: $2,725,125;

Prejudgment Interest: $36.63 per day from 4/27/12 until the date of judgment;

Prejudgment Interest: $37.40 per day from 11/17/10 until the date of judgment;

Prejudgment Interest: $36.44 per day from 8/18/11 until the date of judgment;

Prejudgment Interest: $20.80 per day from 6/10/11 until the date of judgment;

Prejudgment Interest: $18.39 per day from 2/21/14 until the date of judgment;

[00031644.1]

Prejudgment Interest: $24.45 per day from 6/10/11 until the date of judgment;

Attorney's Fees: $453,523.68;

Costs: $989.90 and

Post-Judgment Interest at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

Plaintiffs shall serve a copy of this Report & Recommendation upon Defendants. Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2), a party may serve and file objections to this Report and Recommendation 14 days after being served.

**IT IS SO ORDERED:**


**DATED:** _____


_____
**MARIA ELENA JAMES**
**UNITED STATES MAGISTRATE JUDGE**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031644.1]