1  Stephen C. Seto (SBN 175458)
   (sseto@wcjuris.com)
2  **BERGQUIST WOOD McINTOSH SETO** LLP
   1470 Maria Lane, Suite 300
3  Walnut Creek, CA  94596
   Telephone:   (925) 938-6100
4  Facsimile:   (925) 938-4354

5  Attorneys for Plaintiffs FIDELITY NATIONAL TITLE
   INSURANCE COMPANY, CHICAGO TITLE
6  INSURANCE COMPANY AND COMMONWEALTH
   TITLE INSURANCE COMPANY

7

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                          OAKLAND DIVISION

12

13  ALLY BANK, et al.,                    No. C-11-00896 YGR (MEJ)

14              Plaintiffs,               **[PROPOSED] REPORT &**
                                          **RECOMMENDATION RE:**
15  vs.                                   **APPLICATION FOR DEFAULT**
                                          **JUDGMENT BY PLAINTIFFS FIDELITY**
16                                        **NATIONAL TITLE INSURANCE**
                                          **COMPANY, CHICAGO TITLE**
17  LARA KARAKASEVIC, et al.,             **INSURANCE COMPANY AND**
                                          **COMMONWEALTH TITLE**
18              Defendants.               **INSURANCE COMPANY AGAINST**
                                          **DEFENDANT LAURA PEZZI**
19

20                                        Hearing
                                          Date:   July 16, 2015
21                                        Time:   10:00 a.m.
                                          Ctrm:   B
22                                        Judge:  Maria Elena James

23

24                            **INTRODUCTION**

25          Pending before the Court is Plaintiffs FIDELITY NATIONAL TITLE INSURANCE

26  COMPANY ("FNTIC"), CHICAGO TITLE INSURANCE COMPANY ("CHICAGO

27  TITLE"), COMMONWEALTH TITLE INSURANCE COMPANY'S

28  ("COMMONWEALTH") motion for default judgment ("Motion") against Defendant Laura

[00031645.1]
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  Pezzi ("Defendant" or "PEZZI"). Dkt. No. 794. Plaintiffs request that the Court enter an order

2  granting default judgment on its claims against Defendant for $3,341,625 in compensatory and

3  treble damages plus pre-judgment and post-judgment interest plus attorney's fees of

4  $453,523.68 and $989.90 in costs. PEZZI has not responded to the Motion. After carefully

5  reviewing Plaintiffs' Motion, evidence and the controlling authorities, the undersigned

6  RECOMMENDS that the District Court grant Plaintiffs' Motion for Default Judgment for the

7  reasons set forth below.

8                                    **BACKGROUND**

9      **The Loch Dane Scheme**

10     PEZZI previously owned the property located at 4137 Loch Dane Court, Antelope,

11  California ("LOCH DANE"). (Fourth Amended Complaint ["FAC"], ¶ 26; Dkt No. 398.)

12     In 2006, PEZZI borrowed $360,000 from SCME Mortgage Bankers, Inc. FAC, ¶ 125.

13  The loan, which was later assigned to Aurora Loan Services, was secured by a deed of trust (the

14  "AURORA DOT") against LOCH DANE. FAC, ¶ 125, Exh. 27.

15     In 2010, PEZZI began falling behind on her loan with Aurora. PEZZI, in collaboration

16  with certain of the other defendants in this action, responded to their financial difficulties by

17  commencing an "Administrative Default Procedure" ("ADP") whereby PEZZI executed and

18  recorded a sham lien, forged reconveyance and other fraudulent documents, to deceive future

19  buyers into proceeding with a "short sale" purchase of LOCH DANE as described more fully

20  below. 4thAC, p. 3:8-17.

21     In April 2010, and as part of the ADP, PEZZI signed a $375,000 deed of trust (the

22  "OREPLEX DOT") in favor of defendant Oreplex International, LLC ("OREPLEX"). FAC, ¶

23  126. The transaction was a sham in that no sums were ever lent by OREPLEX to PEZZI.

24  FAC, ¶ 126, Exh. 28.

25     In late April 2010, PEZZI caused a fraudulent Substitution of Trustee and Deed of

26  Reconveyance (the "LOCH DANE RECONVEYANCE") to be executed and recorded falsely

27  reconveying the AURORA DOT to herself. FAC, ¶ 127, Exh. 29.

28

BERGQUIST WOOD McINTOSH SETO LLP

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031645.1]

In May 2010, PEZZI sold LOCH DANE to third-party Nobuco Financials, LLC. FAC, ¶ 129, Exh. 30. In June 2010, Nobuco flipped LOCH DANE to third-party Real Estate Star FAC, ¶ 129, Exh. 31.

In August 2010, Real Estate Star sold LOCH DANE to Tatyana Madina, for $210,000. FAC, ¶ 130, Exh. 32. In conjunction with the purchase of LOCH DANE, Madina obtained title insurance from CHICAGO TITLE. FAC, ¶ 134. Because of the fraudulent LOCH DANE RECONVEYANCE, **none** of the sale proceeds from the sale went to pay the AURORA DOT. FAC, ¶ 132.

After the sale closed, Aurora Bank discovered the LOCH DANE RECONVEYANCE and rescinded it. FAC, ¶ 133, Exh. 34. Madina subsequently discovered the Loch Dane scheme and she made a claim to CHICAGO TITLE under her title policy. FAC, ¶ 134. On December 9, 2011, CHICAGO TITLE paid Aurora $206,000 to remove the AURORA DOT and satisfy Medina's claim. Declaration of Erika Cadwallader ("Cadwallader Decl.") ¶ 6. CHICAGO TITLE is pursing PEZZI as a subrogee under the title policy. FAC, ¶ 134.

## A. Dunlay Drive Scheme

Defendants Jon and Alicia Sanders (the "SANDERSES") previously owned the property located at 5479 Dunlay Drive, Sacramento, California ("DUNLAY DRIVE"). FAC, ¶¶ 19-20.

In July 2004, the Sanderses borrowed $396,000 from Countrywide Home Loans n/k/a BAC Home Loans. FAC, ¶ 110. The loan was secured by a deed of trust (the "BAC DOT") against the Property. FAC, ¶ 110, Exh. 19.

In the spring of 2010, the SANDERSES began falling behind on their loan with BAC Home Loans. The SANDERSES, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of DUNLAY DRIVE as described more fully below. FAC, p. 3:8-17, ¶ 35.

On July 26, 2010, the SANDERSES signed and caused to be recorded a $567,000 deed of trust (the "GH-DUNLAY DRIVE DOT") in favor of defendant Golden Hills Trust

BERGQUIST WOOD
McINTOSH SETO LLP

{00031645.1}

("GOLDEN HILLS TRUST").  FAC, ¶ 111.  The principals of GOLDEN HILLS TRUST are PEZZI and defendant Remus A. Kirkpatrick ("KIRKPATRICK").  GOLDEN HILLS TRUST is sham business operated by its principals KIRKPATRICK and PEZZI to perpetuate the Dunlay Drive scheme and the others set forth below.  FAC, ¶¶ 23 and 51.  The loan was a fraudulent transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the SANDERSES.  FAC, ¶ 111, Exh. 20.

In September 2010, PEZZI caused a Revised Full Reconveyance (the "DUNLAY DRIVE RECONVEYANCE") to be executed purportedly reconveying the BAC DOT to the SANDERSES.  FAC, ¶ 114, Exh. 22.

On November 17, 2010, Li-Ling Sung and Tiee-Shan Tsai (the "Sungs") purchased DUNLAY DRIVE from the SANDERSES for $195,000.  FAC, ¶¶ 115 and 118.  However, because of the DUNLAY DRIVE RECONVEYANCE, **none** of the sale proceeds went to pay the BAC DOT.  FAC, ¶ 120.  Instead, the proceeds went directly to defendants including GOLDEN HILLS TRUST**.**  FAC, ¶ 120, Exh. 24.

After the sale closed, the predecessor beneficiary of the BNY DOT, Deutsche Bank, discovered the DUNLAY DRIVE RECONVEYANCE.  FAC, ¶¶ 113 and 122.   Deutsche Bank then rescinded the DUNLAY DRIVE RECONVEYANCE and foreclosed on DUNLAY DRIVE.  FAC, ¶ 122, Exhs. 25 and 26.

The Sungs subsequently discovered the Dunlay Drive Scheme, and they made a claim to CHICAGO TITLE under their title policy.  FAC, ¶ 124.  On October 24, 2011, CHICAGO TITLE paid the Sungs $ 195,000 to satisfy their claim.  Cadwallader Decl., ¶ 24.  CHICAGO TITLE is, therefore, subrogated to the Sungs' rights and is pursuing PEZZI in that capacity.  FAC, ¶ 124.

**B.    Shannon Bay Scheme**

Defendants Daniel and Kelly Young (the "YOUNGS") previously owned the property located at 5170 Shannon Bay Drive, Rocklin, California ("SHANNON BAY").  FAC, ¶ 30.

In 2005, the YOUNGS borrowed $340,000 from America's Wholesale Lender.  FAC, ¶ 135.)  The loan, which was eventually assigned to Bank of New York ("BNY"), was secured by

[00031645.1]

a deed of trust (the "BNY DOT") against SHANNON BAY. (FAC, ¶ 135, Exh. 35.)

In 2006, the YOUNGS borrowed $39,800 from Countrywide Bank (now Bank of America). (FAC, ¶ 136.) The loan was secured by a deed of trust (the "BAC DOT"). (FAC, ¶ 136, Exh. 35.)

In the spring of 2010, the YOUNGS began falling behind on their loan with BNY and BNY commenced foreclosure proceedings. The YOUNGS, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of SHANNON BAY as described more fully below. FAC, p. 3:8-17 and ¶ 35.

On April 28, 2010, the YOUNGS signed a $410,000 deed of trust (the "KIRKPATRICK DOT") in favor of KIRKPATRICK. FAC, ¶ 138. The transaction was a sham in that no sums were ever lent by KIRKPATRICK to the YOUNGS. FAC, ¶ 138, Exh. 37.

On May 19, 2010, and in an effort to stop BNY from foreclosing on the SHANNON BAY, PEZZI forged a Notice of Rescission of Notice of Default ("SHANNON BAY NOTICE OF RESCISSION") relative to the BNY DOT. FAC, ¶ 140, Exh. 38. In the SHANNON BAY NOTICE OF RESCISSION, PEZZI falsely states that she is an "authorized representative" of California Reconveyance Company. *Id.*

In June 2010, the YOUNGS caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "FIRST SHANNON BAY RECONVEYANCE") to be executed and recorded falsely reconveying the BNY DOT to themselves. FAC, ¶ 141, Exh. 39. The FIRST SHANNON BAY RECONVEYANCE was notarized by PEZZI who falsely acknowledged that the reconveyance had been executed by a representative of BAC Home Loans Servicing, Inc. FAC, ¶ 142, Exh. 39.

Also in June 2010, the YOUNGS caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "SECOND SHANNON BAY RECONVEYANCE") to be executed and recorded falsely reconveying the BAC DOT to themselves. FAC, ¶ 143, Exh. 40. The SECOND SHANNON BAY RECONVEYANCE was notarized by PEZZI who falsely

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031645.1]

1  acknowledged that the reconveyance had been executed by a representative of BAC Home
2  Loans Servicing, Inc.  FAC, ¶ 144, Exh. 39.

3      In August 2010, the YOUNGS sold SHANNON BAY to Altus Equity for $140,000.
4  FAC, ¶ 145, Exh. 41.  On September 13, 2010, Altus Equity sold the PROPERTY to Eric and
5  Cindy Andersen (the "Andersens") for $190,000.  FAC, ¶ 146, Exh. 42.  As part of the
6  purchase, the Andersens obtained title insurance from COMMONWEALTH.  FAC, ¶ 153.
7  Because of the fraudulent Shannon Bay Reconveyances, **none** of the sale proceeds from either
8  sale went to pay the BNY or BAC DOT.  FAC, ¶ 150.

9      After the sale closed, BNY discovered the FIRST SHANNON BAY
10 RECONVEYANCE and recorded a Rescission of Deed of Reconveyance.  FAC, ¶ 151, Exh.
11 44.  In March 2011, BNY foreclosed on the BNY DOT and the Andersens lost SHANNON
12 BAY.  FAC, ¶ 152, Exh. 45.

13     After the Andersens discovered the Shannon Bay scheme, they made a claim to
14 COMMONWEALTH under their title policy FAC, ¶ 153.   On August 10, 2011,
15 COMMONWEALTH paid $141,871.15 and on August 18, 2011 it paid $48,127.85 to satisfy
16 the Andersens' claim.  Cadwallader Decl., ¶ 9.

17 **C.  The Roaring Camp Scheme**

18     Defendants Kevin Keith and Christy Keith (the "KEITHS") previously owned the
19 property located at 1420 Roaring Camp Court, Plumas Lake, CA ("ROARING CAMP").  FAC,
20 ¶ 36; Dkt No. 398.

21     In December 2005, the KEITHS borrowed $275,000 from Fidelity Home Mortgage
22 ("FHM").  FAC, ¶ 154.  The loan was secured by a deed of trust (the "FHM DOT") against
23 ROARING CAMP.  *Id.,* Exh. 46.

24     In 2010, the KEITHS began falling behind on their loan with FHM.  The KEITHS, in
25 collaboration with PEZZI, responded to their financial difficulties by commencing an ADP
26 whereby defendant executed fraudulent documents to deceive future buyers into proceeding
27 with a "short sale" purchase of ROARING CAMP as described more fully below.  FAC, p. 3:8-
28 17.

BERGQUIST WOOD
McINTOSH SETO LLP

In October 2010, the KEITHS signed and caused to be recorded a $283,000 deed of trust (the "GH ROARING CAMP DOT") in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 155, Exh. 47.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the KEITHS.  FAC, ¶ 155.  GOLDEN HILLS TRUST is a sham business used by PEZZI and his co-conspirator KIRKPATRICK to further their fraudulent schemes including the Roaring Camp scheme.  FAC, ¶ 59.

In December 2010, Jennifer Pezzi, executed a fraudulent Substitution of Trustee and Deed of Reconveyance (the "ROARING CAMP RECONVEYANCE") to be executed and recorded falsely reconveying the FHM DOT to the KEITHS.  FAC, ¶ 156, Exh. 48. In February 2011, the KEITHS sold ROARING CAMP to Richard W. Heinz, trustee for the Richard W. Heinz Living Trust for $91,000.  FAC, ¶ 157, Exh. 49.   In conjunction with the purchase, Heinz obtained a title policy from FNTIC.  FAC, ¶ 163.

Because of the fraudulent ROARING CAMP RECONVEYANCE, **none** of proceeds from Heinz's went to pay the FHM DOT.  FAC, ¶ 161.  Instead, the sale proceeds went to defendants, including the GOLDEN HILLS TRUST.  *Id.*

After the sale closed, FHM discovered the ROARING CAMP RECONVEYANCE and disputed its validity.  FAC, ¶ 162.  Heinz learned of the dispute and he made a claim to FNTIC under his title policy.  FAC, ¶ 163.  On June 10, 2011, FNTIC paid $108,500 to satisfy Heinz's claim.  FAC, ¶ 163; Cadwallader Decl., ¶ 13.  FNTIC is pursuing PEZZI as a subrogee under its title policy.  Cadwallader Decl., ¶ 13.

**D.    Valley West**

Defendants Fahed Eweis and Nadia Eweis (the "EWEISES") previously owned the property located at 2313 Valley West Drive, Santa Rosa, California ("VALLEY WEST"). FAC, ¶ 49; Dkt No. 398.)

In September 2005, the EWEISES borrowed $480,000 from Aegis Wholesale Corporation that was secured by a deed of trust (the "AEGIS DOT") against VALLEY WEST. FAC, ¶ 180, Exh. 62.

In 2010, the EWEISES began falling behind on their loan with Aegis. The EWEISES, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of VALLEY WEST as described more fully below. FAC, p. 3:8-17, ¶ 51.

In January 2011, the EWEISES signed and caused to be recorded a $580,000 deed of trust (the "GH VALLEY WEST DOT") in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 182, Exh. 63. The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the EWEISES. FAC, ¶ 182. GOLDEN HILLS TRUST is a sham business used by PEZZI and her co-conspirator KIRKPATRICK to further their fraudulent schemes. FAC, ¶ 59.

On March 25, 2011, defendants fraudulently executed a Notice of Rescission of Notice of Default relative to the AEGIS DOT (the "VALLEY WEST NOTICE OF RESCISSION"). FAC, ¶ 183. The Notice states that when recorded it should be returned to PEZZI. *Id.*

On March 28, 2011, PEZZI caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "VALLEY WEST RECONVEYANCE") to be executed and recorded falsely reconveying the AEGIS DOT to the EWEISES. FAC, ¶ 184, Exh. 65.

In April 2011, the EWEISES sold VALLEY WEST to Karrie Hanna for $191,500. FAC, ¶ 185. When Hanna purchased VALLEY WEST, she obtained title insurance from CHICAGO TITLE. Cadwallader Decl., ¶ 14.

Because of the fraudulent VALLEY WEST RECONVEYANCE, **none** of the sale proceeds from sale went to pay the AEGIS DOT. FAC, ¶ 189. Instead, the sale proceeds went to PEZZI's business GOLDEN HILLS TRUST. *Id.*

After the sale closed, the beneficiary of the AEGIS DOT foreclosed on VALLEY WEST. Hanna made a claim to CHICAGO TITLE under her title policy, and on April 27, 2012, CHICAGO TITLE paid Hanna $191,500 to satisfy her claim. Cadwallader Decl., ¶ 27. CHICAGO TITLE is pursing PEZZI as a subrogee under the title policy. FAC, ¶ 192.

**E.      The Almondwood Scheme**

Defendant Randall Crawford ("CRAWFORD") previously owned the property located

FINDINGS OF FACT AND CONCLUSIONS OF LAW

{00031645.1}

at 7593 Almondwood Avenue, Citrus Heights, CA ("ALMONDWOOD").  FAC, ¶ 58; Dkt No. 398.)

In 2006, CRAWFORD borrowed $240,500 from Washington Mutual Bank nka JPMorgan Chase, N.A., which was secured by a deed of trust (the "JPM DOT") against ALMONDWOOD.  FAC, ¶ 193, Exh. 35.

In 2010, CRAWFORD began falling behind on his loan with JPM.  CRAWFORD, in collaboration with PEZZI, responded to his financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of ALMONDWOOD as described more fully below.  FAC, p. 3:8-17, ¶¶ 59, 62.

In June 2010, and as part of the ADP, CRAWFORD quitclaimed ALMONDWOOD to defendant Shon-Te-East-A.  FAC, ¶ 195, Exh. 68.  The conveyance was notarized by PEZZI. FAC, ¶ 195, Exh. 69.

Also in June 2010, CRAWFORD signed and caused to be recorded a $280,000 deed of trust (the "GH ALMONDWOOD DOT") in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 194, Exh. 67.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to CRAWFORD.  FAC, ¶ 194.  GOLDEN HILLS TRUST is a sham business used by PEZZI and her co-conspirator KIRKPATRICK to further their fraudulent schemes including the Almondwood scheme.  FAC, ¶ 59.

In October 2010, PEZZI caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "ALMONDWOOD RECONVEYANCE") to be executed and recorded falsely reconveying the JPM DOT to CRAWFORD.  FAC, ¶ 197, Exh. 71.

In January 2011, CRAWFORD sold ALMONDWOOD to Brian Phuong for $77,500. FAC, ¶ 203.  The ALMONDWOOD sale was an alleged short sale in that even though the June 2010 GH-ALMONDWOOD DOT allegedly was for $280,000.  FAC, ¶ 202.  In January 2011, GOLDEN HILLS TRUST agreed to accept $70,234.60 to close the sale. *Id.,* Exh., 74.  When Phoung purchased ALMONDWOOD, he obtained title insurance from CHICAGO TITLE. Cadwallader Decl., ¶ 14.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

[00031645.1]

Because of the fraudulent ALMONDWOOD RECONVEYANCE, **none** of the sale proceeds from sale went to pay the JPM DOT.  FAC, ¶ 203.  Instead, the sale proceeds went to PEZZI's business GOLDEN HILLS TRUST.

After Phoung discovered the Almondwood scheme, he made a claim to CHICAGO TITLE under his title policy, and on February 21, 2014, CHICAGO TITLE paid $95,875 to remove the JPM DOT from ALMONDWOOD.  Cadwallader Decl., ¶ 16-17.   FNTIC is pursing PEZZI as a subrogee under the title policy.  *Id., ¶* 17.

**F.     The Green Garden Scheme**

Defendants Donald Porto and Patricia Porto (the "PORTOS") previously owned the property located at 6303 Green Garden Drive, Bakersfield, CA ("GREEN GARDEN").  FAC, ¶ 204; Dkt No. 398.

In December 2005, the PORTOS borrowed $300,000 from M&T Mortgage Corporation ("M&T") that was secured by a deed of trust (the "M&T DOT") against GREEN GARDEN. FAC, ¶ 204, Exh. 75.  In December 2006, the PORTOS borrowed $95,231 from RBS Citizens, N.A. ("RBS") that was secured by a deed of trust (the "RBS DOT") against GREEN GARDEN.  FAC, ¶ 205, Exh. 76.

In 2010, the PORTOS began falling behind on their mortgage obligations.  The PORTOS, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby defendant executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of GREEN GARDEN as described more fully below. FAC, p. 3:8-17.

In October 2010, the PORTOS signed and caused to be recorded a $395,000 deed of trust (the "GH GREEN GARDEN DOT") in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 206, Exh. 77.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the PORTOS.  FAC, ¶ 206.  GOLDEN HILLS TRUST is a sham business used by PEZZI and her co-conspirator KIRKPATRICK to further their fraudulent schemes including the Green Garden scheme.  FAC, ¶¶ 23 and 68.

BERGQUIST WOOD McINTOSH SETO LLP

[00031645.1]

In September 2010, PEZZI caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "FIRST GREEN GARDEN RECONVEYANCE") to be executed and recorded falsely reconveying the M&H DOT to the PORTOS. FAC, ¶ 208, Exh. 79.

Also in September 2010, PEZZI caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "SECOND GREEN GARDEN RECONVEYANCE") to be executed and recorded falsely reconveying the RBS DOT to the PORTOS. FAC, ¶ 209, Exh. 80.

In December 2010, Crichton Friedly and Janet Friedly purchased GREEN GARDEN. FAC, ¶ 210. However, because of the fraudulent FIRST and SECOND GREEN GARDEN RECONVEYANCES, none of the sale proceeds went to pay the M&T DOT or the RBS DOT. FAC, ¶ 214. Instead, the sale proceeds went to defendants, including the GOLDEN HILLS TRUST. *Id.*

After the Friedlys purchased GREEN GARDEN, RBS Bank filed a complaint against the Friedlys to restore the RBS DOT and foreclose on GREEN GARDEN. Cadwallader Decl., ¶ 20. Bank of America then filed a cross complaint against RBS Bank to restore its BOA DOT. *Id.* The Friedlys made a claim under their title policy, and on May 31, 2012, CHICAGO TITLE paid $10,000 to remove the RBS DOT from GREEN GARDEN and $117,500 to remove the BOA DOT from GREEN GARDEN. *Id.*

## DISCUSSION

**A.     Jurisdiction and Service of Process**

In considering whether to enter default judgment, a court must first determine whether it has jurisdiction over the subject matter and the parties to the case. *In re Tuli*, 173 F.3d 707, 712 (9th Cir. 1999).

1. <u>Subject Matter Jurisdiction</u>

Federal courts are courts of limited jurisdiction and are presumptively without jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court may dismiss an action on its own motion if it finds that it lacks subject matter jurisdiction over the action. *Fiedler v. Clark*, 714 F.2d 77, 78-79 (9th Cir. 1983); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court

BERGQUIST WOOD
McINTOSH SETO LLP

must dismiss the action.").

Here, the Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' third and fourth causes of action ("RICO Claims") against PEZZI arise under the laws of the United States – specifically 18 U.S.C. §§ 1962(c) and (d).  FAC, ¶ 89.  The Court has supplemental jurisdiction to hear the other causes of action against PEZZI under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the RICO Claims.

Personal Jurisdiction

"[A] court may exercise personal jurisdiction over a defendant consistent with due process only if he or she has 'certain minimum contacts' with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Here, the Court has personal jurisdiction over PEZZI because she is an individual residing in California and was a former owner of one of the subject properties.  FAC, ¶ 26; *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007).

Venue is proper in this District under 28 U.S.C. § 1391 because: (1) One or more of the defendants resides in this District; (2) Many of the events giving rise to this litigation occurred in this District; and (3) Some of the real property at issue in this case is located in this District.  FAC, ¶ 90.

Service of Process

Additionally, the Court must "assess the adequacy of the service of process on the party against whom default is requested." *Bank of the W. v. RMA Lumber Inc.*, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008).  "Without a proper basis for jurisdiction, or in the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *S.E.C.*, 504 F.3d at 1138-39.

Plaintiffs served the Summons and complaint on PEZZI on September 11, 2011.  Dkt No. 91-1.  Plaintiffs served the FAC on PEZZI on May 1, 2013.  Dkt No. 409.  PEZZI failed to

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031645.1]

BERGQUIST WOOD
McINTOSH SETO LLP

appear or otherwise respond to the FAC within the time prescribed by the Federal Rules of Civil Procedure Rule 12(a). Dkt No. 441. PEZZI is not a minor or an incompetent person. Dkt 441-1. PEZZI is not in military service or otherwise exempted from a default judgment under the Soldiers' and Sailors' Civil Relief Act of 1940. *Id.*

In June 2013, Plaintiffs filed a request for entry of default against PEZZI. Dkt No. 441. The clerk entered PEZZI's default on June 7, 2013. Dkt. No. 453.

### 2.   **Legal Standard for Entry of Default Judgment**

Federal Rule of Civil Procedure 55(b)(2) permits a court, following default by a defendant, to enter default judgment in a case. "The district court's decision whether to enter default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In determining whether default judgment is appropriate, the Ninth Circuit has enumerated the following factors for the court to consider: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Where a default judgment is granted, the scope of relief is limited by Federal Rule of Civil Procedure 54(c), which states that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

### 3.   **Application to this Case**

Applying the foregoing *Eitel* factors to the case at bar, the undersigned finds that Plaintiffs are entitled to entry of default judgment.

#### 1.   The possibility of prejudice to the Plaintiff

The first factor that the Court considers in determining whether to grant a default judgment is the possibility of prejudice to Plaintiffs if a default judgment is not entered. *Eitel*, 782 F.2d at 1471-72. Courts have held that prejudice exists where denying the requested default judgment would leave the plaintiff without a proper remedy. *See Landstar Range, Inc. v. Parth Enter., Inc.,* 725 F.Supp.2d 916, 920 (C.D.Cal.2010) (concluding that

[00031645.1]

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BERGQUIST WOOD
McINTOSH SETO LLP

the plaintiff would suffer prejudice if default judgment was not entered where the plaintiff

had only received partial payment owed under a contract).

Here, absent entry of a default judgment, Plaintiffs would be prejudiced by having to

incur additional fees and costs litigating against PEZZI even though PEZZI has not

appeared to defend against the FAC.  Accordingly, this factor weighs in favor of entry of

default judgment.

> 2.  The merits of plaintiff's substantive claim and the sufficiency of the complaint

The second and third *Eitel* factors require the Court to look at the merits of Plaintiffs'

substantive claims and the sufficiency of the allegations of the Complaint.  *Eitel*, 782 F.2d at

1471-72.  Here, Plaintiffs seek a default judgment on their claims for fraud, conspiracy to

defraud violations of RICO and conspiracy to violate RICO.

> *a.  FRAUD*

"Under California law, the indispensable elements of a fraud claim include a false

representation, knowledge of falsity, intent to defraud, justifiable reliance, and damages."  *Vess

v. Ciba-Geigy Corp. USA*, 317 F.ed 1097, 1005 (9th Cir.2003) (quotation and citation omitted).

Rule 9 of the Federal Rules of Civil Procedure requires a plaintiff to allege a fraud claim with

particularity.  Fed. R. Civ. P. 9(b).

Here, PEZZI made several knowing misrepresentations and fraudulent omissions to

perpetuate the Loch Dane, Shannon Bay, Almondwood, Roaring Camp, Valley West, Green

Garden and Dunlay Drive Schemes.

> **(1)    Loch Dane Scheme**

As the owner of LOCH DANE, PEZZI knew that she had borrowed $360,000 from

SCME Mortgage Bankers, Inc. that was secured by the AURORA DOT, and that the loan was

never paid off.  FAC, ¶¶ 125, 127 and Exh. 27.

PEZZI also knew that OREPLEX never lent her any money, yet she signed and

recorded the OREPLEX DOT.  FAC, ¶ 126, Exh. 28.  Further, PEZZI knowingly engaged in

the ADP to fraudulently reconvey the AURORA DOT.  FAC, ¶¶ 93, 126-128.  On March 28,

2011, PEZZI caused a fraudulent Substitution of Trustee and Deed of Reconveyance (the "LOCH DANE RECONVEYANCE") to be executed and recorded falsely reconveying the AURORA DOT to herself. FAC, ¶ 127, Exh. 29.

PEZZI then sold LOCH DANE to third-party Nobuco Financials, LLC. FAC, ¶ 129, Exh. 30. In June 2010, Nobuco flipped LOCH DANE to third-party Real Estate Star FAC, ¶ 129, Exh. 31. In August 2010, Real Estate Star sold Loch Dane to CHICAGO TITLE's insured, Tatyana Madina, for $210,000. FAC, ¶¶ 130 and 134, Exh. 32. Because of the fraudulent LOCH DANE RECONVEYANCE, **none** of the sale proceeds from the sale went to pay the AURORA DOT. FAC, ¶ 132.

Further, CHICAGO TITLE and its insured, Madina, were justified in relying on PEZZI's representations in the public record that the AURORA DOT had been paid. FAC ¶¶ 126, 127 and 285. As a result of the execution and recording of the LOCH DANE RECONVEYANCE, it appeared that the AURORA DOT had been paid and legally removed.

After Madina purchased LOCH DANE, Aurora Bank discovered the LOCH DANE RECONVEYANCE and rescinded it. FAC, ¶ 133, Exh. 34. Madina subsequently discovered the LOCH DANE RECONVEYANCE scheme and made a claim to CHICAGO TITLE under her title policy. FAC, ¶ 134. On December 9, 2011, CHICAGO TITLE paid Aurora $206,000 to remove the AURORA DOT and satisfy Madina's claim. Cadwallader Decl., ¶ 6. CHICAGO TITLE is entitled to purse PEZZI as a subrogee under the title policy. FAC, ¶ 134.

### (2) Dunlay Drive Scheme

The SANDERSES previously owned DUNLAY DRIVE. FAC, ¶¶ 19-20. In July 2004, the SANDERSES borrowed $396,000 that was secured by the BAC DOT against the Property. FAC, ¶ 110, Exh. 19.

In the spring of 2010, the SANDERSES began falling behind on their loan with BAC Home Loans. The SANDERSES, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of DUNALY DRIVE as described more fully below. FAC, p. 3:8-17, ¶ 35.

BERGQUIST WOOD McINTOSH SETO LLP

[00031645.1]

On July 26, 2010, the SANDERSES signed and caused to be recorded the "GH-DUNLAY DRIVE DOT.  FAC, ¶ 111.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the SANDERSES.  FAC, ¶ 111, Exh. 20.

In September 2010, PEZZI caused the DUNLAY DRIVE RECONVEYANCE to be executed purportedly reconveying the BAC DOT to the Sanders.  FAC, ¶ 114, Exh. 22.

On November 17, 2010, the Sungs purchased DUNLAY DRIVE from the SANDERSES for $195,000.  FAC, ¶¶ 115 and 118.  However, because of the DUNLAY DRIVE RECONVEYANCE, **none** of the sale proceeds went to pay the BAC DOT.  FAC, ¶ 120.  Instead, the proceeds went directly to defendants including GOLDEN HILLS TRUST**.** FAC, ¶ 120, Exh. 24.

After the sale closed, Deutsche Bank discovered the DUNLAY DRIVE RECONVEYANCE.  FAC, ¶¶ 113 and 122.   Deutsche Bank then rescinded the DUNLAY DRIVE RECONVEYANCE and foreclosed on DUNLAY DRIVE.  FAC, ¶ 122, Exhs. 25 and26.

The Sungs subsequently discovered the Dunlay Drive Scheme, and they made a claim to CHICAGO TITLE under their title policy.  FAC, ¶ 124.  On October 24, 2011, CHICAGO TITLE paid the Sungs $195,000 to satisfy their title claim.  Cadwallader Decl., ¶ 24.  CHICAGO TITLE is, therefore, subrogated to the Sungs' rights and is pursuing PEZZI in that capacity.  FAC, ¶ 124.

### (3) Shannon Bay Scheme

The YOUNGS previously owned SHANNON BAY.  FAC, ¶ 30.  In 2005 and 2006, the YOUNGS entered into two loans: one for $340,000 that was secured by the BNY DOT (FAC, ¶ 135, Exh. 35) and the second for $39,800 from Countrywide Bank that was secured by the BAC DOT.  FAC, ¶ 136, Exh. 36.

In the spring of 2010, the YOUNGS began falling behind on their loan with BNY and BNY commenced foreclosure proceedings.  The YOUNGS, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed

{00031645.1}

fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of SHANNON BAY.  FAC, p. 3:8-17, ¶ 35

On May 19, 2010, and in an effort to stop Bank of New York from foreclosing on the SHANNON BAY, PEZZI forged a Notice of Rescission of Notice of Default relative to the BNY DOT.  FAC, ¶ 140, Exh. 38.  In the Notice of Rescission, PEZZI falsely states that she is an "authorized representative" of California Reconveyance Company.  (*Id.*)

In June 2010, the YOUNGS caused the FIRST SHANNON BAY RECONVEYANCE to be executed and recorded falsely reconveying the BNY DOT to themselves.  FAC, ¶ 141, Exh. 39.)   The FIRST SHANNON BAY RECONVEYANCE was notarized by PEZZI who falsely acknowledged that it had been signed by an authorized representative of BAC Home Loans Servicing, Inc.  FAC, ¶ 142, Exh. 39.

Also in June 2010, the YOUNGS caused the SECOND SHANNON BAY RECONVEYANCE to be executed and recorded falsely reconveying the BAC DOT to themselves.  FAC, ¶ 143, Exh. 40.  The SECOND SHANNON BAY RECONVEYANCE was notarized by PEZZI who falsely acknowledged that it had been signed by an authorized representative of BAC Home Loans Servicing, Inc.  FAC, ¶ 144, Exh. 39.

In August 2010, the YOUNGS sold SHANNON BAY to Altus Equity for $140,000. FAC, ¶ 145, Exh. 41.  On September 13, 2010, Altus Equity sold the PROPERTY to the Andersens for $190,000.  FAC, ¶ 146, Exh. 42.  Because of the fraudulent Shannon Bay Reconveyances, **none** of the sale proceeds from either sale went to pay the BNY or BAC DOT. FAC, ¶ 150.  Instead, the sale proceeds went to defendants, including the GOLDEN HILLS.  *Id.*

Further, COMMONWEALTH and its insureds, the Andersens, were justified in relying on PEZZI's representations in the public record that BNY and BAC DOTs had been property reconveyed.  FAC ¶ 142- 144 and 285.  As a result of the execution and recording of the FIRST SHANNON BAY RECONVEYANCE and the SECOND SHANNON BAY RECONVEYANCE, it appeared that the BNY and BAC DOTS had been paid and legally removed.

[00031645.1]

After the sale closed, BNY discovered the FIRST SHANNON BAY RECONVEYANCE and recorded a Rescission of Deed of Reconveyance.  FAC, ¶ 151, Exh. 44.  In March 2011, BNY foreclosed on the BNY DOT and the Andersens lost the PROPERTY.  FAC, ¶ 152, Exh. 45.

After the Andersens discovered the Shannon Bay scheme, they made a claim to COMMONWEALTH under their title policy FAC, ¶ 153.   On August 10, 2011, COMMONWEALTH paid $141,871.15 and on August 18, 2011 it paid $48,127.85 to satisfy the Andersens' claim.  Cadwallader Decl., ¶ 9.

### (4) The Roaring Camp Scheme

The KEITHS previously owned ROARING CAMP.  FAC, ¶ 36.  In December 2005, the KEITHS borrowed $275,000 from FHM (FAC, ¶ 154) that was secured by the FHM DOT. FAC, ¶ 154, Exh. 46.

In 2010, the KEITHS began falling behind on their loan with FHM.  The KEITHS, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of ROARING CAMP as described more fully below.  FAC, p. 3:8-17.

In October 2010, the KEITHS signed and caused to be recorded the GH ROARING CAMP DOT in favor of defendant GOLDEN HILLS TRUST.  FAC, ¶ 155, Exh. 47.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the KEITHS.  FAC, ¶ 155.  GOLDEN HILLS TRUST is a sham business used by PEZZI, among others, to further her fraudulent schemes including the Roaring Camp scheme.  FAC, ¶ 59.

In December 2010, Jennifer Pezzi, executed the ROARING CAMP RECONVEYANCE falsely reconveying the FHM DOT to the KEITHS.  FAC, ¶ 156, Exh. 48.  In February 2011, the KEITHS sold ROARING CAMP to FNTIC's insured, Heinz, for $91,000.  FAC, ¶ 157, Exh. 49.   Because of the fraudulent ROARING CAMP RECONVEYANCE, **none** of proceeds from Heinz's went to pay the FHM DOT.  FAC, ¶ 161.  Instead, the sale proceeds went to PEZZI's company GOLDEN HILLS TRUST, among others.  *Id.*

Further, FNTIC and its insured, Heinz, were justified in relying on PEZZI's representations in the public record that the GH ROARING CAMP DOT was a valid obligation that had to be paid as part of any purchase and sale of ROARING CAMP.  FAC, ¶¶ 59, 155 and Exh. 47.

After the sale closed, FHM discovered the ROARING CAMP RECONVEYANCE and disputed its validity.  FAC, ¶ 162.  Heinz learned of the dispute and he made a claim to FNTIC under his title policy.  FAC, ¶ 163.  On June 10, 2011, FNTIC paid $108,500 to satisfy Heinz's claim.  FAC, ¶ 163; Cadwallader Decl., ¶ 12-13.  FNTIC is pursuing PEZZI as a subrogee under its title policy.  Cadwallader Decl., ¶ 13.

### (5) The Valley West Scheme

The EWEISES previously owned VALLEY WEST.  FAC, ¶ 49.  In September 2005, the EWEISES borrowed $480,000 from Aegis Wholesale Corporation that was secured by the AEGIS DOT.  FAC, ¶ 180, Exh. 62.

In 2010, the EWEISES began falling behind on their loan with Aegis.  The EWEISES, in collaboration with PEZZI, responded to their financial difficulties by commencing an ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of VALLEY WEST.  FAC, p. 3:8-17, ¶ 51.

In January 2011, the EWEISES signed and caused to be recorded the GH VALLEY WEST DOT in favor of defendant GOLDEN HILLS TRUST.  FAC, ¶ 182, Exh. 63.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the EWEISES.  FAC, ¶ 182.

On March 25, 2011, defendants fraudulently executed the VALLEY WEST NOTICE OF RESCISSION.  FAC, ¶ 183.  The Notice states that when recorded it should be returned to PEZZI.  *Id.*  On March 28, 2011, PEZZI caused the VALLEY WEST RECONVEYANCE to be executed and recorded falsely reconveying the AEGIS DOT to the EWEISES.  FAC, ¶ 184, Exh. 65.

In April 2011, the EWEISES sold VALLEY WEST to Karrie Hanna for $191,500.  FAC, ¶ 185.  When Hanna purchased VALLEY WEST, she obtained title insurance from

{00031645.1}

CHICAGO TITLE.  Cadwallader Decl., ¶ 25.  Because of the fraudulent VALLEY WEST RECONVEYANCE, **none** of the sale proceeds from sale went to pay the AEGIS DOT.  FAC, ¶ 189.  Instead, the sale proceeds went to PEZZI's business GOLDEN HILLS TRUST.  *Id.*

After the sale closed, the beneficiary of the AEGIS DOT foreclosed on VALLEY WEST.  Hanna made a claim to CHICAGO TITLE under her title policy, and on April 27, 2012, CHICAGO TITLE paid Hanna $191,500 to satisfy her claim.  Cadwallader Decl., ¶ 27.  CHICAGO TITLE is pursing PEZZI as a subrogee under the title policy.  FAC, ¶ 192.

### (6) Almondwood Scheme

CRAWFORD previously owned ALMONDWOOD.  FAC, ¶ 30.  In 2006, CRAWFORD borrowed $240,500 that was secured by the JPM DOT.  FAC, ¶ 193, Exh. 35.

In the spring of 2010, CRAWFORD began falling behind on his loan.  CRAWFORD, in collaboration with PEZZI, responded to CRAWFORD's financial difficulties by commencing the ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of ALMONDWOOD.  FAC, p. 3:8-17, ¶¶ 59 and 62.

In June 2010, and as part of the ADP, CRAWFORD quitclaimed ALMONDWOOD to defendant Shon-Te-East-A.  FAC, ¶ 195, Exh. 68.  The assignment was notarized by PEZZI.  FAC, ¶ 195, Exh. 69.

Also in June 2010, CRAWFORD signed and caused to be recorded the GH ALMONDWOOD DOT in favor of defendant GOLDEN HILLS TRUST.  FAC, ¶ 194, Exh. 67.  The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to CRAWFORD.  FAC, ¶ 194.  GOLDEN HILLS TRUST is a sham business used by PEZZI, KIRPATRICK and others to further their fraudulent schemes including the Almondwood scheme.  FAC, ¶ 59.

In October 2010, PEZZI caused the ALMONDWOOD RECONVEYANCE to be executed and recorded falsely reconveying the JPM DOT to CRAWFORD.  FAC, ¶ 197, Exh. 71.   In January 2011, CRAWFORD sold ALMONDWOOD to insured Brian Phuong for $77,500.  FAC, ¶ 203.  The ALMONDWOOD sale was an alleged short sale in that even though the June 2010 GH-ALMONDWOOD DOT allegedly was for $280,000.  FAC, ¶ 202.

[00031645.1]

In January 2011, GOLDEN HILLS TRUST agreed to accept $70,234.60 to close the sale. *Id.,* Exh., 74.

Because of the fraudulent ALMONDWOOD RECONVEYANCE, **none** of the sale proceeds from sale went to pay the JPM DOT. FAC, ¶ 203. Instead, the sale proceeds went to PEZZI's business GOLDEN HILLS TRUST. FAC, ¶¶ 202 and 203.

CHICAGO TITLE and its insured, Phoung, were justified in relying on PEZZI's representations in that (a) the GH-ALMONDWOOD DOT was a valid deed of trust that had to be paid as the part of any sale and (b) the JPM DOT was no longer enforceable. FAC, ¶¶ 59, 194, 197, 202-203, Exhs. 67, 71and 74. As a result of the execution and recording of the GH-ALMONDWOOD DOT AND THE ALMONDWOOD RECONVEYANCE, it appeared that the JPM DOT had been paid and legally replaced by the GH-ALMONDWOOD DOT.

After Phoung discovered the Almondwood scheme, he made a claim to CHICAGO TITLE under his title policy, and on February 21, 2014, CHICAGO TITLE paid $95,875 to satisfy Phoung's claim. Cadwallader Decl., ¶ 17. CHICAGO TITLE is pursing PEZZI as a subrogee under the title policy. *Id.*

### (7) The Green Garden Scheme

The PORTOS previously owned GREEN GARDEN. FAC, ¶ 204; Dkt No. 398. In December 2005, the PORTOS borrowed $300,000 from M&T that was secured by the M&T DOT. FAC, ¶ 204, Exh. 75. In December 2006, the PORTOS borrowed $95,231 from RBS that was secured by the RBS DOT. FAC, ¶ 205, Exh. 76.

In 2010, the PORTOS began falling behind on their mortgage obligations. The PORTOS, in collaboration with PEZZI, responded to their financial difficulties by commencing the ADP whereby PEZZI executed fraudulent documents to deceive future buyers into proceeding with a "short sale" purchase of GREEN GARDEN. FAC, p. 3:8-17.

In October 2010, the PORTOS executed the GH GREEN GARDEN DOT in favor of defendant GOLDEN HILLS TRUST. FAC, ¶ 206, Exh. 77. The loan was a sham transaction in that no sums were ever lent by GOLDEN HILLS TRUST to the PORTOS. FAC, ¶ 206.

[00031645.1]

GOLDEN HILLS TRUST is a sham business used by PEZZI, KIRKPATRICK and others to further her fraudulent schemes including the Green Garden scheme.  FAC, ¶¶ 23 and 68.

In September 2010, PEZZI caused the FIRST GREEN GARDEN RECONVEYANCE to be executed and recorded falsely reconveying the M&H DOT to the PORTOS.  FAC, ¶ 208, Exh. 79.   Also in September 2010, PEZZI caused the SECOND GREEN GARDEN RECONVEYANCE to be executed and recorded falsely reconveying the RBS DOT to the PORTOS.  FAC, ¶ 209, Exh. 80.

In December 2010, Crichton Friedly and Janet Friedly purchased GREEN GARDEN.  FAC, ¶ 210.  However, because of the fraudulent FIRST and SECOND GREEN GARDEN RECONVEYANCES, none of the sale proceeds went to pay the M&T DOT or the RBS DOT.  FAC, ¶ 214.  Instead, the sale proceeds went to defendants, including the GOLDEN HILLS TRUST.  *Id.*

CHICAGO TITLE and its insureds, the Friedlys, were justified in relying on PEZZI's representations in that (a) the GH GREEN GARDEN DOT was a valid deed of trust that had to be paid as the part of any sale and (b) the M&T AND RBS DOTs were no longer enforceable.  FAC, ¶¶ 23, 68, 206, 208-209, Exhs. 77, 79 and 80.   As a result of the execution and recording of the GH GREEN GARDEN DOT AND THE FIRST and SECOND GREEN GARDEN RECONVEYANCES, it appeared that the M&T and RBS DOTs had been paid and legally replaced by the GH GREEN GARDEN DOT.

After the Friedlys purchased GREEN GARDEN, RBS Bank filed a complaint against the Friedlys to restore the RBS DOT and foreclose on GREEN GARDEN.  Cadwallader Decl., ¶ 20.  Bank of America then filed a cross complaint against RBS Bank to restore its BOA DOT.  *Id.*  The Friedlys made a claim under their title policy, and on May 31, 2012, CHICAGO TITLE paid $10,000 to remove the RBS DOT from GREEN GARDEN and $117,500 to remove the BOA DOT from GREEN GARDEN.  *Id.*

b.  *CONSPIRACY TO DEFRAUD*

As to the claim of conspiracy to defraud, conspiracy is a "legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the

BERGQUIST WOOD McINTOSH SETO LLP

{00031645.1}

immediate tortfeasors a common plan or design in its perpetration." *Arei II Cases*, 216 Cal. App. 4th 1004, 1021-22 (2013) citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). A civil conspiracy "must be activated by the commission of an actual tort," such as fraud. *Id.*

To support a conspiracy claim, a plaintiff must allege the following elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Id.* (citing *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995)). While a complaint must contain more than a bare allegation that the defendants conspired, a complaint is sufficient if it apprises the defendant of the character and type of facts and circumstances upon which she was relying to establish the conspiracy. *Id.* (citing *Schessler v. Keck*, 125 Cal. App. 2d 827, 833 (1954)).

While a party seeking to establish a civil conspiracy must show that the members acted in concert, knew of the intended act, and agreed tacitly to achieve that act, "[i]t must be recognized, however, that because of the very nature of a conspiracy, 'its existence must often be inferentially and circumstantially derived from the character of the acts done, the relations of the parties and other facts and circumstances suggestive of concerted action.'" *Id.* "While a complaint must contain more than a bare allegation the defendants conspired, a complaint is sufficient if it apprises the defendant of the 'character and type of facts and circumstances upon which she was relying to establish the conspiracy.'" *Id.* (internal citations omitted).

Here, Plaintiffs alleged the formation and operation of the conspiracy between PEZZI, KIRKPATRICK, GOLDEN HILLS TRUST and OREPLEX which consisted of a plan to execute and record fraudulent documents to stop foreclosure proceedings against LOCH DANE, DUNLAY DRIVE, SHANNON BAY, ROARING CAMP, VALLEY WEST, ALMONDWOOD and GREEN GARDEN that made it seem as though (1) the valid liens against the properties had been satisfied, and (2) GOLDEN HILLS TRUST, OREPLEX OR KIRKPATRICK had a valid lien against the property that had to be paid through any sale.

PEZZI participated in the Loch Dane, Dunlay Drive, Shannon Bay, Roaring Camp, Valley West, Almondwood and Green Garden schemes to defraud Plaintiffs by causing the

BERGQUIST WOOD
McINTOSH SETO LLP

-23-

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

execution and recordation of the fraudulent OREPLEX DOT, GH DUNLAY DRIVE DOT, DUNLAY DRIVE RECONVEYANCE, LOCH DANE RECONVEYANCE, SHANNON BAY NOTICE OF RESCISSION, FIRST SHANNON BAY RECONVEYANCE, SECOND SHANNON BAY RECONVEYANCE, GH ROARING CAMP DOT, GH VALLEY WEST DOT, VALLEY WEST NOTICE OF RESCISSION, VALLEY WEST RECONVEYANCE, GH ALMONDWOOD DOT, ALMONDWOOD RECONVEYANCE, FIRST GREEN GARDEN RECONVEYANCE, SECOND GREEN GARDEN RECONVEYANCE and GH GREEN GARDEN DOT.  These fraudulent documents made it appear to Plaintiffs that the prior liens had been paid off, that there were no encumbrances on the subject property other than defendants' deeds of trust, that the foreclosure proceedings against the subject property had been stopped, and that PEZZI, KIRKPATRICK and their other co-conspirators were entitled to the sale proceeds of the properties rather than the legitimate lienholder.  If the properties had been foreclosed upon or sold legally, PEZZI, KIRKPATRICK, GOLDEN HILLS TRUST and OREPLEX would not have received any money whatsoever.

As a result of the PEZZI's participation in the conspiracy to defraud Plaintiffs as subrogee, Plaintiff have been damaged in the amount of $1,114,375 plus interest.

### c.   VIOLATIONS OF RICO (18 U.S.C. § 1962(c))

The Supreme Court has declared that: "[T]he Racketeer and Corrupt Practices Act ('RICO')] is to be read broadly . . . [t]his is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be literally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.* 473 U.S. 479, 490 (1985).  Indeed, the Supreme Court has consistently reversed appellate decisions that narrowly interpret and apply the provisions of RICO.  *See*, e.g., *United States v. Turkette*, 452 U.S. 576 (1981) (reversing narrow reading that RICO only prohibits infiltration of legitimate businesses and not illegitimate enterprises); *Sedima, S.P.R.L, supra*, 473 U.S. at 479 (reversing narrow reading that RICO imposes liability only on those who are criminally convicted).

The elements of a civil RICO claim are as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to

[00031645.1]

plaintiff's 'business or property.' " *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir.1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)).

### (1) The Enterprise

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, (2001)  The term "enterprise" is defined in 18 U.S.C. § 1961(4) as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Living Designs, Inc., v. E.I. Dupont de Nemours and Co*., 431 F.3d 353, 361 (9th Cir. 2005).

Here, the "person" is PEZZI and the enterprise" is an association-in-fact that engaged in the business of real estate sales, real estate leasing, mortgage loans, notarizing real property documents, performing escrow services, performing real estate brokerage services and other activities affecting interstate commerce.  FAC, ¶ 298.  The primary purpose of the enterprise was to defraud plaintiffs through a series of phantom loans, fraudulent reconveyances, phony short sales and subsequent re-sales.  *Id.*  Defendants, including PEZZI, worked together as members of the enterprise to achieve the association's purpose of defrauding plaintiffs.  *Id.* Examples of such cooperation include the execution and recordation of the fraudulent OREPLEX DOT, GH DUNLAY DRIVE DOT, DUNLAY DRIVE RECONVEYANCE, LOCH DANE RECONVEYANCE, SHANNON BAY NOTICE OF RESCISSION, FIRST SHANNON BAY RECONVEYANCE, SECOND SHANNON BAY RECONVEYANCE, GH VALLEY WEST DOT, VALLEY WEST NOTICE OF RESCISSION, VALLEY WEST RECONVEYANCE, GH ROARING CAMP DOT, GH ALMONDWOOD DOT, ALMONDWOOD RECONVEYANCE, FIRST GREEN GARDEN RECONVEYANCE, SECOND GREEN GARDEN RECONVEYANCE and GH GREEN GARDEN DOT and the diversion of sale proceeds from legitimate lenders to the enterprise, PEZZI and the other defendants.  The enterprise has been operating for a period of almost two years to allow defendants to pursue their fraudulent scheme and is ongoing.  FAC, ¶ 299.

[00031645.1]

(2) <u>PEZZI participated in the Enterprise's Affairs Through a Pattern of</u>
<u>"Racketeering Activity."</u>

18 U.S.C. § 1962(c) requires that the defendant conduct or participate "directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity...." *Sun Sav. And LoanAss'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir.1987).  Participate means to "take part in."  Thus, to participate, directly or indirectly, in the enterprise one must have some part in directing those affairs."  *Walter v. Drayson*, 538 F.3d 1244, 1247-1248 (9th Cir. 2008).

"Racketeering activity" is defined in Section 1961 and includes numerous examples of what constitutes "racketeering activity."  The definition of racketeering activity in Section 1961(B) includes any act indictable under the various provisions of Title 18 of the United States Code, including but not limited to section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) and section 1344 (relating to financial institution fraud).  To establish a pattern of racketeering activity, the plaintiff must show the existence of at least two predicate racketeering acts that are related and that "amount to or pose a threat of continued criminal activity." *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir.1991).

As set forth below, PEZZI participated in the enterprise's affairs through numerous acts of wire, mail and bank fraud.

i.      Wire Fraud

Federal statutes prohibit the use of "interstate wire, radio or television communications" to perpetuate "any scheme to artifice to default."  18 U.S.C. § 1343   "The only essential elements of mail fraud under 18 U.S.C. § 1341 are that the defendant devised a scheme to defraud and that for the purpose of executing this scheme he used the mails or caused the mails to be used." *U.S. v. Outpost Development Co*., 552 F.2d 868, 870 (9th Cir. 1977).  The elements for wire fraud are the same as mail fraud, except that the defendant used wires instead of mail.  18 U.S.C. § 1343; *Fountain v. U.S.*, 357 F.3d 250, 255 (2nd Cir. 2004).

Here, PEZZI participated in the enterprise's affairs through a pattern of wire fraud by causing the OREPLEX DOT, GH DUNLAY DRIVE DOT, DUNLAY DRIVE

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031645.1]

RECONVEYANCE, LOCH DANE RECONVEYANCE, SHANNON BAY NOTICE OF
RESCISSION, FIRST SHANNON BAY RECONVEYANCE, SECOND SHANNON BAY
RECONVEYANCE, GH VALLEY WEST DOT, VALLEY WEST RECONVEYANCE, GH
ROARING CAMP DOT, GH ALMONDWOOD DOT, ALMONDWOOD
RECONVEYANCE, FIRST GREEN GARDEN RECONVEYANCE, SECOND GREEN
GARDEN RECONVEYANCE and GH GREEN GARDEN DOT to be electronically recorded
into the public record.  PEZZI also participated in wire fraud when her company, GOLDEN
HILLS TRUST, electronically received payments on the GH DUNLAY DRIVE DOT, GH
ROARING CAMP DOT, GH VALLEY WEST DOT, GH ALMONDWOOD DOT and GH
GREEN GARDEN DOT.  See e.g., FAC, ¶¶ 120, 150, 161, 189, 202, 214, 295, 300, 302 and
304.  The enterprise's pattern of fraudulent activity has continued for a period of over two years
and is ongoing.  FAC, ¶¶ 295 and 301.

### ii.      Mail Fraud

PEZZI also participated in the enterprise's affairs through a pattern of mail fraud by
directing on the DUNLAY DRIVE RECONVEYANCE, LOCH DANE RECONVEYANCE,
SHANNON BAY NOTICE OF RESCISSION, FIRST SHANNON BAY RECONVEYANCE,
SECOND SHANNON BAY RECONVEYANCE, VALLEY WEST RECONVEYANCE,
VALLEY WEST NOTICE OF RESCISSION, ALMONDWOOD RECONVEYANCE, FIRST
GREEN GARDEN RECONVEYANCE and SECOND GREEN GARDEN
RECONVEYANCE that copies of this documents be mailed when recorded.  FAC, ¶¶ 295 and
303.

### iii.      Bank Fraud

In order to establish bank fraud under 18 U.S.C. § 1344, it is sufficient if plaintiff shows
that defendant obtained funds from a financial institution by means of false or fraudulent
pretenses, representations or promises.  *U.S. v. Schwartz*, 899 F.2d 243, 246 (3d Cir. 1990),
*cert. denied*, 498 U.S. 901 (1990); *Weiner v. Napoli*, 772 F.Supp. 109, 119-120 (E.D.N.Y.
1991).

Here, PEZZI participated in the enterprise's affairs through a pattern of bank fraud

through the sale of LOCH DANE and the execution and recordation of the GH DUNLAY

DRIVE DOT, GH ROARING CAMP DOT, GH VALLEY WEST DOT, GH

ALMONDWOOD DOT and GH GREEN GARDEN DOT which resulted in funds being

diverted from the legitimate lenders to the enterprise and ultimately PEZZI and the other

defendants.   FAC, ¶¶ 295 and 304.

          (3) <u>PEZZI's Conduct Proximately Injured Plaintiffs</u>

Finally, Plaintiffs must be "injured in [their] business or property by reason of a

violation of section 1962."  18 U.S.C. § 1964(c)  Here, Plaintiffs were injured by the PEZZI'S

conduct  because they were forced to pay their insured approximately $1,113,875 as a result of

PEZZI's involvement in the Loch Dane, Shannon Bay, Roaring Camp, Valley West,

Almondwood and Green Garden schemes.  Plaintiffs also were damaged because they have

incurred $453,923.68 in attorney's fees and 989.90 in costs prosecuting this action.  FAC, pp.

65-66; Cadwallader Decl., ¶ 28.

          b.     *CONSPIRACY TO VIOLATE RICO*

Section 1962(d) makes it unlawful for a person "to conspire to violate any of the

provisions of subsections (a), (b) or (c) of [section 1961]."  In addition, "[t]he existence of this

agreement [to conspire] may be either express or inferred from a defendant's conduct." *In Re*

*3Com Securities Litigation*, 761 F.Supp. 1411, 1418 (N.D.Cal. 1990).

PEZZI violated 18 U.S.C. § 1962(d) because she agreed with the other defendants to

participate in the affairs of an enterprise through a pattern of racketeering activity, or agreed to

assist or profit from such conduct or participation. FAC, ¶ 308.  In addition, PEZZI knew her

conduct or the conduct of her co-conspirators such as KIRKPATRICK constituted a pattern of

racketeering activity. *Id.*

PEZZI knew her and the other defendants' predicate acts were part of a pattern of

racketeering activity because of the similarity and frequency of the events in the scheme.  FAC,

¶ 309.  PEZZI's conduct has injured and damaged plaintiffs in the principal amount of

$1,114,375.  Plaintiffs also were damaged because they have incurred $453,523.68 in attorney's

fees and 989.90 in costs prosecuting this action.  FAC, pp. 65-66; Cadwallader Decl., ¶ 28.

Finally, PEZZI's conduct has harmed the general public and threatens continued harm.  FAC, ¶¶ 304-305.

### 3.  The sum of money at stake in the action

The fourth *Eitel* factor addresses the amount of money at stake in relation to the seriousness of the defendant's conduct.  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp 2d 1172, 1176 (C.D.Cal.2002).  When the amount at stake is substantial or unreasonable in light of the allegations in the complaint, default judgment is disfavored.  *See Eitel,* 782 F.2d at 1472.  (affirming the denial of default judgment where the plaintiff sought $3 million in damages and the parties disputed material facts in the pleadings).

Here, Plaintiffs seek $3,343,125 in compensatory and treble damages plus interest plus attorney's fees, which is proportional to the harm caused by PEZZI's conduct.  *See FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir.2009) (affirming award of over $17 million in equitable monetary relief that represented the amount of loss incurred by consumers); *FTC v. Springtech 77376 LLC*, 2013 WL 5955395 at *2 (C.D.Cal. May 30, 2014) (finding $7,279,000 in damages appropriate where proportional to the seriousness of the defendants' conduct and where the damages represented the actual amount consumers paid for defendants' products).  The principal amount of money at stake equals the amount of money Plaintiffs had to pay their insureds.  Accordingly, this factor weighs in favor of entry of default judgment.

### 4.  The possibility of dispute concerning material facts

The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case.  *Eitel*, 782 F.2d at 1471-72.  Here, no genuine issues of material fact are likely to exist because the allegations in the complaint are taken as true.  *Televideo Sys., Inc., v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1992).  Upon entry of default, the defendant is "deemed to have admitted all well-pleaded factual allegations" in the complaint.  *DirectTV, Inc.v. Hoa Huynh*, 503 F.3d 847, 851 (9th Cir. 2007).  Thus, this factor favors entry of default judgment.

{00031645.1}

5.      Whether default was due to excusable neglect

The sixth *Eitel* factor examines whether PEZZI's failure to respond to the FAC was the result of excusable neglect. *Eitel*, 782 F.2d at 1471-72. As set forth above, PEZZI was given adequate notice of this lawsuit. Second, Plaintiffs named PEZZI to this action in the FAC, which was filed on April 30, 2013. PEZZI was properly served. After she failed to answer, the Clerk of the Court entered default against her. There is nothing in the record suggesting that PEZZI's failure to appear and litigate this matter is based on excusable neglect. *See Shanghai Automation Instr. Co. v. Kuei*, 194 F.Supp.2d 995, 1005 (N.D.CA. 2001) (default after proper service was not excusable neglect). Thus, this factor support default judgment.

6.      The strong policy underlying the Federal Rules of Civil Procedure
         favoring decisions on the merits

The last *Eitel* factor examines whether the policy of deciding a case based on the merits precludes entry of default judgment. *Eitel*, 782 F.2d at 1472. In *Eitel*, the Ninth Circuit admonished that "[c]ases should be decided on their merits whenever reasonably possible." *Id.* However, courts have recognized that "the mere existence of [Rule 55(b)] indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation and citation omitted). Similarly, other courts have stated that default judgment is appropriate when a defendant refuses to litigate a case. *See, e.g.*, *Bd. of Trs. v. RBS Wash. Blvd, LLC*, 2010 WL 145097, at *4 (N.D. Cal. Jan. 8, 2010). Here, PEZZI has not responded to communication efforts by Plaintiffs or participated in these proceedings. As such, a decision on the merits would not be possible. In situations such as this, Rule 55(b) allows the Court to grant default judgment. Thus, this final factor weighs in favor of granting Plaintiffs' Motion.

7.      Summary of the *Eitel* Factors

Based on the foregoing analysis, the undersigned finds that each of the *Eitel* factors weighs in favor of granting default judgment and it will enter default judgment against PEZZI on Plaintiffs' claims for fraud, conspiracy to defraud violations of RICO and conspiracy to violate RICO.

[00031645.1]

### D.     Relief Sought

After determining liability, the Court then calculates the amount of damages that should be awarded. *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1078 (C.D. Cal. 2012). This two-step process is proper because, while for purposes of default judgment the Court generally accepts as true the factual allegations of the complaint, the Court need not do so regarding damages. *Id.*

Plaintiffs were required to make $1,114,375 in payments to their insureds as a result of PEZZI's conduct:

| Insured | Scheme | Damages | Date | Interest/Day |
|---------|--------|---------|------|--------------|
| Madina | Loch Dane | $206,000 | 12/9/11 | $39.51 |
| Sungs | Dunlay Drive | $195,000 | 11/17/10 | $37.40 |
| Andersens | Shannon Bay | $190,000 | 8/18/11 | $36.44 |
| Heinz | Roaring Camp | $108,500 | 6/10/11 | $20.80 |
| Hanna | Valley West | $191,500 | 4/27/12 | $36.63 |
| Phuong | Almondwood | $95,875 | 2/21/14 | $18.39 |
| Friedlys | Green Garden | $127,500 | 6/10/11 | $24.45 |

Under 18 U.S.C. § 1964(c), a plaintiff who prevails on a RICO claim is entitled to recover treble damages. *H.J. Inc. v. Northwestern Bell, supra,* 492 U.S. at 232; *Alexander v. Incway Corp.*, 2013 WL 5603932, * 20 (C.D.CA).   Plaintiffs, therefore, seek damages of $1,114,375 x 3 or $3,343,125.

Plaintiffs also seek prejudgment interest on the amount they were required to pay their insureds.  In California, there is no statute setting the rate of prejudgment interest for a fraud claim, therefore, the constitutional rate of 7% applies.  *Michaelson v. Hameda*, 29 Cal.App. 4th 1566, 1587 (1994).  Thus, Plaintiffs are entitled to an award of prejudgment interest at the rate of 7% per annum as set forth in the chart above until the judgment is entered.

Further, 18 U.S.C. § 1964(c) states that a plaintiff who prevails on a RICO claim is entitled to recover attorney's fees.  *H.J. Inc., 492 U.S. at 232; Alexander v. Incway Corp.*, *supra,* 2013 WL 5603932, * 20.  Plaintiffs have incurred $453,523.68 in attorney's fees

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031645.1]

prosecuting this action and $989.90 in costs; therefore, Plaintiffs seek a judgment against PEZZI for those sums.  FAC, pp. 65-66; Cadwallader Decl., ¶ 28.

Next, Plaintiffs request an award of post-judgment interest.  While state law determines the rate of prejudgment interest in diversity actions, post-judgment interest is governed by federal law. 28 U.S.C. § 1961; *Citicorp Real Estate v. Smith*, 155 F.3d 1097, 1107-08 (9th Cir. 1998). Plaintiffs are therefore entitled to post-judgment interest at the federal rate pursuant to 28 U.S.C. § 1961, to be calculated from the date of the entry of judgment. Post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). Thus, Plaintiffs are entitled to post-judgment interest at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

## CONCLUSION

Based on this analysis, the undersigned RECOMMENDS that the District Court enter a default judgment in favor of Plaintiffs for fraud, conspiracy to defraud, violations of RICO and conspiracy to violate RICO against PEZZI as follows:

Compensatory and Treble Damages: $3,343,125;

Prejudgment Interest: $39.51 per day from 12/9/11 until the date of judgment;

Prejudgment Interest: $37.40 per day from 11/17/10 until the date of judgment;

Prejudgment Interest: $36.44 per day from 8/18/11 until the date of judgment;

Prejudgment Interest: $36.63 per day from 4/27/12 until the date of judgment;

Prejudgment Interest: $20.80 per day from 6/10/11 until the date of judgment;

Prejudgment Interest: $18.39 per day from 2/21/14 until the date of judgment;

Prejudgment Interest: $24.45 per day from 6/10/11 until the date of judgment;

Attorney's Fees: $453,523.68;

Costs: $989.90 and

Post-Judgment Interest at a rate equal to the weekly average 1-year constant maturity

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

[00031645.1]

Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

      Plaintiffs shall serve a copy of this Report & Recommendation upon Defendants. Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2), a party may serve and file objections to this Report and Recommendation 14 days after being served.


**IT IS SO ORDERED:**


**DATED:** _____


                  _____
                          **MARIA ELENA JAMES**
             **UNITED STATES MAGISTRATE JUDGE**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**